**Congressman George W. CROCKETT, et al., Plaintiffs,**

v.

**President Ronald W. REAGAN, et al., Defendants.**

Civ. A. No. 81–1034.

United States District Court, District of Columbia.

Oct. 4, 1982.

---

Ira M. Lowe, Lowe, Bressler & Kaufman, Rev. Robert F. Drinan, Prof. Georgetown Univ., Washington, D.C., Frank E. Deale, Michael D. Ratner, Morton Stavis, Margaret L. Ratner, Peter Weiss, Doris Peterson, Robert L. Boehm, Arthur Kinoy, New York City, for George W. Crockett, Jr., Anthony C. Beilenson, Phillip Burton, William Clay, Ronald V. Dellums, Mervyn M. Dymally, Robert W. Edgar, Don Ed-

wards, Walter Fauntroy, Thomas Foglietta, Barney Frank, Robert Garcia, William H. Gray, III, Tom Harkin, Mickey Leland, Michael E. Lowry, Barbara A. Mikulski, George Miller, III, Parren J. Mitchell, Anthony Toby Moffett, James L. Oberstar, Richard L. Ottinger, Frederick W. Richmond, Gus Savage, Patricia Schroeder, James M. Shannon, Louis Stokes, Harold Washington and Theodore S. Weiss, all individually and in their capacity as members of the United States House of Representatives, plaintiffs.

Brooke Hedge, Civ.Div., Justice Dept., Charles C. Ruff, U.S. Atty., Washington Legal Foundation, Washington, D.C., for defendants.

Daniel J. Popeo, Washington, D.C., for Senators Roger W. Jensen, Jesse Helms, Paul Laxalt, Strom Thurmond, Robert Dole, James McClure, John G. Tower, Steven Symms, S.I. Hayakawa, Jeremiah Denton, Barry Goldwater, Gordon Humphrey, Orrin G. Hatch, Paula Hawkins, Don Nickles and Dan Quayle; Congressmen Richard Cheney, George Hansen, Eldon Rudd, Bob Livingston, Philip Crane, Larry McDonald, Daniel Crane, Jim Jeffries, John Rousselot, Bob Stump, Daniel Lungren and Jack Fields, amici curiae.

## MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

This case was brought by 29 Members of Congress against Ronald Reagan, individually and in his capacity as President of the United States, Caspar W. Weinberger, individually and in his capacity as Secretary of Defense, and Alexander M. Haig, Jr., individually and in his capacity as Secretary of State.* Plaintiffs have alleged that defendants have supplied military equipment and aid to the government of El Salvador in violation of the War Powers Clause of the

Constitution, the War Powers Resolution, 50 U.S.C. §§ 1541–1548, and Section 502B of the Foreign Assistance Act of 1961, 22 U.S.C. § 2304. More specifically, plaintiffs aver that a civil war is now in progress throughout El Salvador, with the Salvadoran Revolutionary Government Junta and its armed forces on one side, and the Democratic Revolutionary Front and its armed forces known as the Faribundo Marti National Liberation Front (FMLN) on the other. According to the complaint, in addition to the provision of monetary aid and military equipment, the defendants have dispatched at least 56 members of the United States Armed Forces to El Salvador in aid of the Junta. These forces allegedly are in situations where imminent involvement in hostilities is clearly indicated by the circumstances, and are allegedly taking part in the war effort and assisting in planning operations against the FMLN. Plaintiffs claim that this involvement violates Article 1, Section 8, Clause 11 of the Constitution, granting to Congress the exclusive power to declare war, as implemented by the War Powers Resolution (WPR). The WPR requires that absent a declaration of war, a report be made to the Congress within 48 hours of any time when United States Armed Forces have been introduced into hostilities or into situations where imminent involvement in hostilities is clearly indicated by the circumstances,[1] and that 60 days after a report is submitted or is required to be submitted, the President shall terminate any use of United States Armed Forces unless Congress declares war, enacts a specific authorization for such use of United States Armed Forces, or extends the 60-day period for 30 additional days. WPR §§ 4, 5(b), 50 U.S.C. §§ 1543, 1544(b). No report pursuant to the WPR has been made, and American forces have remained more than 60 days since they allegedly were introduced into a situation of hostilities or immi-

---

* Alexander Haig has since been replaced as Secretary of State by George Shultz.

1. Reports are also required when United States Armed Forces are introduced "into the territory, airspace or waters of a foreign nation, while equipped for combat, except for deployments which relate solely to supply, replacement, repair, or training of such forces; or … in numbers which substantially enlarge United States Armed Forces equipped for combat already located in a foreign nation…". WPR § 4(a); 50 U.S.C. § 1543. The mandatory withdrawal after 60 days absent specific authorization provided in § 5(b) does not apply to these circumstances.

nent hostilities without a declaration of war.

■ A cause of action is also stated under Section 502B of the Foreign Assistance Act of 1961, which prohibits the provision of security assistance to "any country the government of which engages in a consistent pattern of gross violations of internationally recognized human rights," which, plaintiffs contend, is the situation in El Salvador. A separate cause of action was originally stated under various provisions of international law (First Amended Complaint, Third Cause of Action), but plaintiffs have since stated that they recognize that there is no cause of action under international law, except as specifically implemented by Section 502B of the Foreign Assistance Act. Statement of Points and Authorities in Opposition to Defendants' Motion to Dismiss at 15–16.

Plaintiffs seek declaratory judgments that the actions of defendants have violated the above-described provisions of law, and a writ of mandamus and/or an injunction directing that defendants immediately withdraw all United States Armed Forces, weapons, and military equipment and aid from El Salvador and prohibiting any further aid of any nature.

Oral argument was held on defendants' motion to dismiss, and *amicus curiae* briefs were accepted from the group of 16 Senators and 13 Members of Congress which had previously moved to intervene.

■ Defendants have urged several grounds for dismissal: that the complaint presents a non-justiciable political question, that plaintiffs have not established standing, that the Court should exercise its equitable discretion to dismiss, and that there is no private right of action under the statutory provisions invoked by plaintiffs. Defendants contend that all of these grounds for dismissal have been given additional force by the passage in December, 1981 of the International Security and Development Cooperation Act of 1981, Pub.L. No. 97–113, 95 Stat. 1519 (1981), which (at § 728) specifically authorizes economic and military assistance to El Salvador, including the assignment of members of the Armed Forces to El Salvador to carry out functions under the Foreign Assistance Act of 1961 or the Arms Export Control Act. However, the 1981 Act is not dispositive of the cause of action under the WPR. It is not claimed that it constitutes the specific authorization as required by Section 8(a) of the WPR, 50 U.S.C. § 1547(a). That section states that authority to introduce armed forces into hostilities or imminent hostilities shall not be inferred from any other provision of law unless such provision specifically authorizes the introduction of United States Armed Forces into hostilities or situations of imminent hostilities *and* states that it is intended to constitute specific statutory authorization within the meaning of the WPR. The 1981 Act clearly does not do so. Also, plaintiffs argue that while the Act may demonstrate Congressional approval for a training function for U.S. forces in El Salvador, it does not demonstrate assent to what they claim is actually occurring, that is, involvement of those forces in hostilities and imminent hostilities.

*The War Powers Resolution*

■ If the merits were reached, the Court would have to decide whether the Resolution is applicable to the American military presence in El Salvador, and if so, what remedial action is appropriate. The Court decides that the cause of action under the WPR in its present posture is non-justiciable because of the nature of the factfinding that would be required, and that the 60-day automatic termination provision is not operative unless a report has been submitted or required to be submitted by Congress or a court.

Although defendants have not emphasized the factual issues, which need not be reached if their motion to dismiss is granted, their pleadings and exhibits do make clear that the position of the government is that the factual circumstances in El Salvador do not trigger the WPR, that is, U.S. Armed Forces have not been "introduced

into hostilities or into situations where imminent involvement in hostilities is clearly indicated by the circumstances." Plaintiffs present a significantly different picture of what is actually occurring in El Salvador, and the relationship of U.S. military personnel to it. Although consideration of the merits might reveal disagreements about the meaning of WPR terms such as "imminent involvement in hostilities," the most striking feature of the pleadings at this stage of the case is the discrepancy as to the facts.

In support of their position, defendants have submitted the declaration of Lieutenant General Ernest Graves, Director of the Defense Security Assistance Agency, whose responsibilities include the administration and oversight of all security assistance programs conducted by the Department of Defense, (Ex. 8 to Defendants' Motion to Dismiss), and a statement by the Department of State provided to Congressman William Broomfield in response to questions about the applicability of the WPR to the dispatch of military personnel to El Salvador and reprinted in the Congressional Record. (Ex. 17 to Defendants' Motion to Dismiss.) According to General Graves, the Military Mobile Training Teams which have been dispatched to El Salvador since November, 1979 have the sole function of training Salvadoran military personnel so as to create a self-training capability in particular skills, and have never served as advisors, accompanied military units on combat operations, or given those units advice on or worked with them to plan or coordinate the actual performance of offensive or defensive combat operations. Although not exactly claiming that American military personnel have never been exposed to hostile fire, Graves asserts that at no time has insurgent activity directly or immediately threatened the security of training personnel sufficiently to warrant withdrawal of

those individuals. The State Department statement echoes General Graves' assessment of the situation. It states that U.S. forces in El Salvador have not and will not act as combat advisors, accompany Salvadoran forces in combat, on operational patrols, or in any situation where combat is likely, and that they have not been subject to attack.

In contrast, plaintiffs contend that American military personnel in El Salvador are taking part in coordinating the war effort and are assisting in planning specific operations against the FMLN. Also, many of the 56 military personnel[2] are alleged to work in and around areas where there is heavy combat. First Amended Complaint at 5–7. Two armed attacks on locations where U.S. military personnel were stationed are described in the Complaint, and another is described in Plaintiffs' Opposition to Defendants' Motion to Dismiss and Exhibit 4X thereto.

More recently, plaintiffs have supplemented their pleadings to bolster their contention that American forces in El Salvador have been introduced into hostilities or imminent hostilities. They rely upon two news articles. The first is to the effect that U.S. Armed Forces are "fighting side by side" with government troops battling against the FMLN. The second concerns a General Accounting Office (GAO) report which reportedly disclosed that U.S. Military personnel in El Salvador are drawing "hostile fire pay," and that a tentative Pentagon ruling that all of El Salvador qualified as a "hostile fire area" was reversed for "policy reasons," possibly to avoid the necessity of reporting to Congress under the WPR. (The actual GPO report has not been submitted.)

In sum, if plaintiffs' allegations are correct, the executive branch does not merely have a different view of the application of the WPR to the facts, but also is distorting

**2.** The numbers and locations of U.S. military personnel in El Salvador have changed since the complaint was filed, as is evident from Ex. 4A to Plaintiffs' Opposition to Defendants' Motion to Dismiss, which describes the withdrawal or reduction in numbers of some teams described in the Complaint and the placement of others, and indicates a total of 40 individuals as of late summer 1981. Ex. 4A at 7. The Court has not been informed as to the current number and locations of U.S. Armed Forces in El Salvador.

the reality of our involvement in El Salvador. This discrepancy as to factual matters is also evident in the contrast between plaintiffs' allegations regarding the human rights situation in El Salvador, and the President's certifications under the Foreign Assistance Act, discussed *infra*. Plaintiffs' allegations, which are to be accepted as true for the purpose of a motion to dismiss, are, at a minimum, disturbing. This nonetheless does not mean that judicial resolution is appropriate to vindicate, allay or obviate plaintiffs' concerns.

The Court concludes that the factfinding that would be necessary to determine whether U.S. forces have been introduced into hostilities or imminent hostilities in El Salvador renders this case in its current posture non-justiciable. The questions as to the nature and extent of the United States' presence in El Salvador and whether a report under the WPR is mandated because our forces have been subject to hostile fire or are taking part in the war effort are appropriate for congressional, not judicial, investigation and determination. Further, in order to determine the application of the 60-day provision, the Court would be required to decide at exactly what point in time U.S. forces had been introduced into hostilities or imminent hostilities, and whether that situation continues to exist. This inquiry would be even more inappropriate for the judiciary.

■ In *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), Justice Brennan identified several categories of "political questions". The question here belongs to the category characterized by a lack of judicially discoverable and manageable standards for resolution. The Court disagrees with defendants that this is the type of political question which involves potential judicial interference with executive discretion in the foreign affairs field. Plaintiffs do not seek relief that would dictate foreign policy but rather to enforce existing law concerning the procedures for decision-making. Moreover, the issue here is not a political question simply because it involves the apportionment of power between the executive and legislative branches. The duty of courts to decide such questions has been repeatedly reaffirmed by the Supreme Court. *See e.g. Nixon v. Fitzgerald,* —— U.S. ——, 102 S.Ct. 2690, 2703–04, 73 L.Ed.2d 349 (1982); *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *Buckley v. Valeo,* 424 U.S. 1, 123, 96 S.Ct. 612, 684, 46 L.Ed.2d 659 (1976).

■ However, the question presented does require judicial inquiry into sensitive military matters. Even if the plaintiffs could introduce admissible evidence concerning the state of hostilities in various geographical areas in El Salvador where U.S. forces are stationed and the exact nature of U.S. participation in the conflict (and this information may well be unavailable except through inadmissible newspaper articles), the Court no doubt would be presented conflicting evidence on those issues by defendants. The Court lacks the resources and expertise (which are accessible to the Congress) to resolve disputed questions of fact concerning the military situation in El Salvador. *See Atlee v. Laird,* 347 F.Supp. 689 (E.D.Pa.1972) (three judge court), *aff'd without opinion,* 411 U.S. 921, 93 S.Ct. 1545, 36 L.Ed.2d 304 (1973); *Holtzman v. Schlesinger,* 484 F.2d 1307 (2d Cir.1973), *cert. denied,* 416 U.S. 936, 94 S.Ct. 1935, 40 L.Ed.2d 286 (1974).

Admittedly, a case could arise with facts less elusive than these. For example, this Circuit in *Mitchell v. Laird,* 488 F.2d 611 (D.C.Cir.1973), held that the court could determine the truth of allegations to the effect that the United States had been involved in hostilities in Indo-China for at least seven years, which hostilities had resulted in one million deaths, including those of 50,000 Americans, and for which the United States had spent at least one hundred billion dollars. If such allegations were true, the court stated, it would conclude that the United States was at war in Indo-China. Were a court asked to declare that the War Powers Resolution was applicable to a situation like that in Vietnam, it would be absurd for it to decline to find

that U.S. forces had been introduced into hostilities after 50,000 American lives had been lost.[3] However, here the Court faces a dispute as to whether a small number of American military personnel who apparently have suffered no casualties have been introduced into hostilities or imminent hostilities. The subtleties of factfinding in this situation should be left to the political branches. If Congress doubts or disagrees with the Executive's determination that U.S. forces in El Salvador have not been introduced into hostilities or imminent hostilities, it has the resources to investigate the matter and assert its wishes. The Court need not decide here what type of congressional statement or action would constitute an official congressional stance that our involvement in El Salvador is subject to the WPR, because Congress has taken absolutely no action that could be interpreted to have that effect. Certainly, were Congress to pass a resolution to the effect that a report was required under the WPR, or to the effect that the forces should be withdrawn, and the President disregarded it, a constitutional impasse appropriate for judicial resolution would be presented. *Goldwater v. Carter,* 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1976) (Powell, J., concurring).

Even if the factfinding here did not require resolution of a political question, this Court would not order withdrawal of U.S. forces at this juncture. At most, it could order that a report be filed. This conclusion is based upon the structure and legislative history of the WPR.

■ The War Powers Resolution, which was considered and enacted as the Vietnam war was coming to an end, was intended to prevent another situation in which a President could gradually build up American involvement in a foreign war without congressional knowledge or approval, eventual-

ly presenting Congress with a full-blown undeclared war which on a practical level it was powerless to stop. While Congress always had the power to deny appropriations supporting a military engagement, it found it politically impossible to do so after large numbers of American lives had been placed at risk and American honor committed. The purpose of the WPR was to give Congress both the knowledge and the mechanism needed to reclaim its constitutional power to declare war. In the words of Senator Javits, one of its authors and prime sponsors, the Resolution

> is an effort to learn from the lessons of the last tragic decade of war in Vietnam which has cost our nation so heavily in blood, treasure, and morale. The War Powers Act would assure that any future decision to commit the United States to any warmaking must be shared in by the Congress to be lawful.

119 Cong.Rec. 1394 (1973).

So that Congress would be informed at the outset of any involvement that could potentially lead to war, the Resolution provides for prior consultation (not at issue here), and early reporting whenever any American troops are introduced into a situation of hostilities, or even imminent hostilities, on the President's initiative and without a declaration of war. The President is not to wait until our forces are actually engaged in combat before informing Congress. Further, the automatic cutoff after 60 days was intended to place the burden on the President to seek positive approval from the Congress, rather than to require the Congress positively to disapprove the action, which had proven so politically difficult during the Vietnam war. To give force to congressional power to declare war, Presidential warmaking would not be justified by congressional silence, but only by a congressional initiative to "declare war."[4] Again in Senator Javits' words,

> The Court merely states that although there might be other barriers to such an action, it would not be a political question.

---

**3.** Since the Court does not fully decide the questions of standing, equitable discretion and private right of action here, it does not conclude that a court should entertain an action to enforce the WPR where the existence of involvement in hostilities is easily ascertainable.

**4.** Because of the complex international implications of a formal declaration of war, and the possible desirability of engaging in military ac-

The approach taken in the War Powers Bill reverses the situation by placing the burden on the Executive to come to Congress for specific authority. The sponsors of the Bill believe that this provision [the 60-day automatic cutoff] will provide an important national safeguard against creeping involvement in future Vietnam style wars."

119 Cong.Rec. 1400 (1973).

The 60-day automatic cutoff provision, referred to in the House Committee report as intended to "deny the President the authority to commit U.S. Armed Forces for more than 120 [changed to 60 in conference] days without further specific congressional approval," H.R.Rep. No. 287, 93rd Cong., 1st Sess., *reprinted in* 1973 U.S.Code Cong. & Ad.News 2346, 2353, was probably the most controversial in the bill which led to the Resolution. The 60-day cutoff was the subject of dissenting views in the committee reports and floor amendments designed to require positive congressional action to require withdrawal, and measured strongly in President Nixon's veto of the bill. However, in the face of powerful opposition, it was included in the final enactment.

Plaintiffs contend that the Resolution is fully self-executing, designed as it is to prevent involvement in military actions without positive action by Congress. When U.S. forces are introduced into hostilities or a situation of imminent hostilities, the reporting requirement automatically comes into play, and the President violates the law if he does not make the mandated report. Further, whether or not he makes the report, the 60-day period begins to run from the time the report should have been submitted. (The Resolution reads, "[w]ithin sixty calendar days after a report is submitted *or is required to be submitted* . . . whichever is earlier . . ." WPR § 5(b), 50 U.S.C. § 1544(b), emphasis added.) Thus, according to the plaintiffs, after 62 days (60

days plus the 48 hours before a report is required), whether or not a report has been made, the President is required to withdraw the Armed Forces if Congress has not declared war or enacted a specific authorization for the action. Plaintiffs contend that a court may find the facts as to whether the situation into which American forces have been introduced constitutes hostilities or imminent hostilities, and if it so finds, it may order the President to make the report or to withdraw the forces.

Defendants do not dispute the interpretation of the basic purpose of the WPR presented here and emphasized by plaintiffs. However, they deny that it is self-executing in a situation where a report has not been submitted. They argue that the decision as to whether a situation warrants a report under the WPR is left to the President's discretion in the first instance. In their view, his failure to submit a report does not justify a court action, and the 60-day period does not begin to run from the time he assertedly should have filed the report. Rather, in instances of disagreement between the President and Congress as to whether a report is required, a "second trigger" is needed to bring the WPR into play. Congress must either take action to express its view that the WPR is applicable to the situation and that a report is required, or, if it desires immediate withdrawal of forces, pass a concurrent resolution directing removal of the forces pursuant to § 5(c) of the WPR, 50 U.S.C. § 1544(c).[5] *Amici* interpret the reference in the 60-day automatic termination provision to a report which "is required to be submitted" to apply to a situation where Congress has voted to require a report, and not, as plaintiffs claim, to a situation where the objective circumstances allegedly require a report but no congressional action has been taken.

tion without a formal declaration, the WPR also provides for specific authorization of an action. This ensures positive congressional action while avoiding a formal declaration.

5. Section 5(c) applies by its terms only to situations where United States Armed Forces are "engaged in hostilities," and therefore presumably not to situations where imminent involvement in hostilities is clearly indicated by the circumstances.

■ The Court finds that the legislative scheme did not contemplate court-ordered withdrawal when no report has been filed, but rather, it leaves open the possibility for a court to order that a report be filed or, alternatively, withdrawal 60 days after a report was filed or required to be filed by a court or Congress. The legislative scheme was carefully designed to force congressional consideration of American military involvement abroad once a report is filed. The priority procedures of Section 6 of the Act, 50 U.S.C. § 1545, assure that a bill or resolution introduced to approve military involvement which has been the subject of a WPR report will be promptly considered by both houses of Congress. Accordingly, while the involvement will automatically terminate after 60 days if either house fails to act or if the two houses are unable to reach an agreement, this can only occur after open and formal consideration of the question by both full houses, provided that at least one member of either house introduces a bill or resolution. In contrast, when no report has been submitted, there will not necessarily be any debate or floor consideration of the issue at all. If plaintiffs' position is correct, total congressional inaction (which perhaps could signify general agreement with the President's appraisal that no report is required) could result in mandatory withdrawal of U.S. forces if a court adjudged that they had been introduced into hostilities or imminent hostilities more than 60 days previously. In all of the extensive debate on the mandatory withdrawal provision, this possibility was never entertained. In fact, Congressman Zablocki, Chairman of the Foreign Affairs Subcommittee on National Security Policy and Scientific Developments which reported out the bill, clearly stated that mandatory withdrawal would not come about without congressional action. Congress would be actively involved in considering legislation either approving or disapproving the President's action virtually as soon as it was introduced, and the ability of any one of the 535 members to trigger the priority procedures would assure that the question came to an eventual up or down vote. 119 Cong. Rec. 24653 (1973). Congress would be well aware that if it failed to specifically authorize the involvement, it would terminate after 60 days. However, in a situation where no report has been filed, and the priority procedures would not be invoked, the majority of Congress might not be of the opinion that a specific authorization is necessary for continued involvement and take no action, unaware that this course would result in mandatory withdrawal. In that instance court-ordered withdrawal could thwart the will of the majority of Congress. Therefore, when a report has not been filed, it is consistent with the purposes and structure of the WPR to require further congressional action before the automatic termination provision operates.

The requirement to file a report, however, is a different matter. The mere filing of a report cannot thwart congressional will, but can only supply information to aid congressional decisionmaking. Although the Court need not reach the question because the nature of the factfinding in these circumstances precludes judicial inquiry, it does not foreclose the possibility of a court determination that a report is required under the WPR. If, hypothetically, a court did order a report under the WPR, Congress would then have 60 days to give the matter its full consideration in accordance with the priority procedures of the Resolution before withdrawal would be automatically required. Likewise, if Congress itself requires a report, the 60 days for consideration of whether or not to authorize the action would begin at that point. Of course, Congress can always order immediate withdrawal if it so chooses.

The arguments discussed above convince the Court that the cause must be dismissed. Therefore, it is unnecessary to reach the other asserted bases for dismissal, which include standing, equitable discretion and lack of a private right of action. As already stated, the Court does not decide that all disputes under the War Powers Resolution would be inappropriate for judicial resolution.

*The Foreign Assistance Act*

Section 502B of the Foreign Assistance Act, 22 U.S.C. § 2304 states in part:

> Except under circumstances specified in this section, no security assistance may be provided to any country the government of which engages in a consistent pattern of gross violations of internationally recognized human rights. 22 U.S.C. § 2304(a)(2).

Plaintiffs (supporting their argument with voluminous documentation, largely reports from Amnesty International and other religious and human rights organizations) contend that the government of El Salvador has engaged in a consistent pattern of gross violations of internationally recognized human rights. Such violations are alleged to include political assassinations of massive numbers of unarmed, innocent civilians, arbitrary arrests, cruel and inhuman punishment and imprisonment, disappearances, and torture. Therefore, plaintiffs contend, the security assistance [6] being provided to El Salvador is illegal and should be enjoined by this Court. Defendants seek dismissal on the same grounds they applied to the WPR: political question, standing, equitable discretion, and lack of private right of action. Because the Court decides that the action under the Foreign Assistance Act must be dismissed in its equitable discretion, it does not reach the other issues.

The doctrine of equitable discretion in congressional plaintiff cases was set forth for this Circuit in *Riegle v. Federal Open Market Committee*, 656 F.2d 873 (D.C. Cir.1981). When a member of Congress is a plaintiff in a lawsuit, concern about separation of powers counsels judicial restraint even where a private plaintiff may be entitled to relief. Where the plaintiff's dispute appears to be primarily with his fellow legislators, "[j]udges are presented not with a chance to mediate between two political branches but rather with the possibility of thwarting Congress's will by allowing a plaintiff to circumvent the processes of democratic decisionmaking." *Id.,* 656 F.2d at 881. Here, plaintiffs' concern that aid is being given to a country which is engaging in a consistent pattern of gross violations of human rights has been directly addressed by Congress. In Section 728 of the International Security and Development Cooperation Act of 1981, assistance to El Salvador was conditioned upon certification by the President, 30 days after enactment and every 180 days thereafter, that the government of El Salvador is making a concerted and significant effort to comply with internationally recognized human rights, is achieving substantial control over all elements of its own armed forces so as to bring an end to the indiscriminate torture and murder of Salvadoran citizens by these forces, is making continued progress in implementing essential economic and political reforms, including the land reform program, and is committed to the holding of free elections. Since its enactment, the President has made two certifications under the Act. Congress has taken no action to end aid to El Salvador under the Foreign Assistance Act, 22 U.S.C. § 2304(c)(4)(A), or by other means. Plaintiffs have asked the court to examine independently the President's certifications of the progress of El Salvador's government in the human rights field, which have been characterized by certain individual members of Congress akin to calling night day or a duck an eagle. Plaintiffs' Reply to Defendants' Supplemental Memorandum in Support of their Motion to Dismiss at 5. Whatever infirmities the President's certifications may or may not suffer, it is clear that under these circumstances plaintiffs' dispute is primarily with their fellow legislators who have authorized aid to El Salvador while specifically addressing the human rights issue, and who have accepted the President's certifications.

The claim under the Foreign Assistance Act differs significantly from that under the War Powers Resolution, which raises a constitutional question of Presidential usurpation of congressional warmaking power. In addition, the Resolution contains a spe-

---

**6.** The Act defines security assistance to include military assistance, economic support under Part V of the Act, military education and training, and sale of defense articles or services.

cific provision that legislation cannot authorize Presidential action subject to the WPR unless it specifically states that it is authorization for the purposes of the WPR. Here there is no such restraint, and, indeed, the Congress has expressed its approval of the aid in question.

While a court upon scrutiny of detailed discovery might not agree with the President's assessment of the human rights situation in El Salvador, and could possibly conclude that the provision of security assistance under these circumstances violates section 502B of the Foreign Assistance Act, the equitable discretion doctrine prevents consideration of these issues on behalf of congressional plaintiffs. Their dispute is primarily with their fellow legislators. Action by this Court would not serve to mediate between branches of government, but merely aid plaintiffs in circumventing the democratic processes available to them.

Therefore, it is this 4th day of October, 1982, hereby

ORDERED, that defendants' motion to dismiss be, and it hereby is, granted, and this cause stands dismissed.