# Overview of the War Powers Resolution

Summary of previous Office of Legal Counsel advice concerning the War Powers Resolution for the purpose of providing guidance in future analyses of War Powers Resolution problems.

October 30, 1984

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

On a number of occasions during this Administration, this Office has provided both written and oral legal advice to you, the Deputy Attorney General, the Counsel to the President and the National Security Council regarding the War Powers Resolution (WPR). This advice has been rendered in connection with the deployment of United States Armed Forces in Lebanon, the provision of military assistance and intelligence to our allies in Central America, the deployment of sophisticated radar aircraft in Chad and in the Sinai, responses to an armed attack on our armed forces in the Gulf of Siddra, the deployment of troops to Grenada, and in various other circumstances. We have summarized the highlights of that advice and outlined certain historical information in this memorandum in order to provide guidance to you and to our respective successors in future analyses of War Powers Resolution problems.

## I. The War Powers Resolution: Summary of Provisions

### A. Stated Constitutional Basis

The War Powers Resolution became effective on November 7, 1973 after Congress overrode President Nixon's veto of the Resolution.[1] It is codified at 50 U.S.C. §§ 1541–1548. Section 1 of the WPR sets out the name of the enactment; § 2 of the WPR states its purpose and the constitutional authorities upon which it is predicated. Its purpose is said "to fulfill the intent of the framers of the Constitution" to

---

[1] President Nixon vetoed the War Powers Resolution on October 24, 1973. His veto message declared that the automatic 60 day termination provision, § 5(b), and legislative veto provision, § 5(c), were unconstitutional. The veto was overridden on November 7 by a four vote margin in the House and by a substantial margin in the Senate.

Senator Javits, one of the principal sponsors of the WPR, had hoped to avoid a veto. He felt that a WPR which was enacted with the approval of the President would constitute a "compact" between Congress and the President. Holt, *The War Powers Resolution: The Role of Congress in U.S. Armed Intervention* 1–2 (1978).

insure that the collective judgment of both the Congress and the President will apply to the introduction of United States Armed Forces into hostilities, or into situations where imminent involvement in hostilities is clearly indicated by the circumstances, and to the continued use of such forces in hostilities or in such situations.

*Id.* Section 2(b) invokes the Necessary and Proper Clause of the Constitution. Section 2(c) declares that the President's constitutional powers as Commander-in-Chief with respect to the introduction of United States Armed Forces into hostilities or situations in which hostilities are clearly indicated "are exercised only pursuant to (1) a declaration of war, (2) specific statutory authorization, or (3) a national emergency created by attack upon the United States, its territories or possessions, or its armed forces."

### B. Consultation

Section 3 of the WPR calls for consultation "with Congress" "in every possible instance . . . before introducing United States Armed Forces" into hostile situations and "regularly" thereafter until hostilities cease or those forces have been removed.

### C. Reporting under the WPR

Section 4(a) of the WPR calls for a report to be filed with Congress within 48 hours in any case in which troops are introduced

> (1) into hostilities or into situations where imminent involvement in hostilities is clearly indicated by the circumstances;

> (2) into the territory, air space or waters of a foreign nation, while equipped for combat . . . ; or

> (3) in numbers which substantially enlarge United States Armed Forces equipped for combat already located in a foreign nation . . . .

Section 4(a) provides that the report must set forth: (A) the circumstances necessitating the introduction of United States Armed Forces; (B) the constitutional and legislative authority under which the forces have been introduced; and (C) the estimated scope and duration of the deployment. Section 4(c) requires the President to report to Congress no less often than every six months, as long as the forces remain in the situation giving rise to the report.

Under § 5(a), the report required by § 4(a)(1) (deployment into hostilities or situations where imminent involvement in hostilities is clearly indicated) must be transmitted to the Speaker of the House and the President *pro tempore* of the Senate and to the House Committee on Foreign Affairs and the Senate Committee on Foreign Relations.

## D. Removal of Troops

Section 5(b) provides that "[w]ithin sixty calendar days after a report is submitted or is required to be submitted pursuant to" § 4(a)(1), the President must terminate the use of United States Armed Forces unless Congress has declared war, enacted a specific authorization for the use of troops, or extended the 60 day period, or unless the President is unable to do so because of an armed attack on the United States. The President may extend the 60–day period by 30 days if "unavoidable military necessity respecting the safety of" the forces "requires the continued use of such armed forces in the course of bringing about a prompt removal of such forces."

Section 5(c) contains an unconstitutional legislative veto device purporting to authorize Congress, acting by a concurrent resolution not subject to the President's veto, to require removal of troops in any situation involving actual hostilities. This Administration testified before Congress that this provision was implicitly invalidated by the Court's decision in *INS* v. *Chadha*, 462 U.S. 919 (1983).[2] Congress has not disputed that conclusion. Indeed, the counsel to the House of Representatives came to virtually the same conclusion.[3]

## E. Miscellaneous Provisions

Section 6 of the WPR sets out expedited procedures for consideration by both Houses of joint resolutions extending the time of the deployment of troops under § 5(b). Section 7 does the same for the unconstitutional concurrent resolution procedure under § 5(c).

Section 8 of the WPR contains certain other miscellaneous provisions. One expressly provides that authority to introduce United States Armed Forces into § 4(a)(1) situations "shall not be inferred" from any provision of law, including any appropriations provision, "unless such provision specifically authorizes the introduction of United States Armed Forces into hostilities . . . and states that it is intended to constitute specific statutory authorization within the meaning of" the WPR. This provision, along with a similar provision negating any similar inferences from any treaty, are intended to preclude Executive Branch reliance for deployments of United States Armed Forces on any ambiguous statutes (including appropriations laws) or treaties.[4] Thus, under § 8 the President's authority to deploy armed forces into hostilities must be grounded in his inherent constitutional powers unless Congress has specifically provided by statute for such deployment.

Subsection § 8(c) states that under the WPR the term "'introduction of United States Armed Forces'" includes the "assignment of members of such

---

[2] *Hearings on the U.S. Supreme Court Decision Governing the Legislative Veto, before the House Comm. on Foreign Affairs*, 98th Cong., 1st Sess. 63 (1983) (remarks of Deputy Attorney General Schmults).

[3] *Hearings, supra* note 2, at 36 (agreeing that § 5(c) is "now presumptively invalid").

[4] Prior to the enactment of the WPR, many enactments of Congress, especially appropriations measures, could justifiably have been regarded by the Executive as constituting implied authority to continue the deployment of our armed forces in hostilities

armed forces to command, coordinate, participate in the movement of, or accompany the regular or irregular military forces of any foreign country or government when such military forces of any foreign country or government are engaged, or there exists an imminent threat that such forces will become engaged, in hostilities."

## II. Selected Facts, Historical Information, Analysis and Conclusions Regarding Applicability of the War Powers Resolution

*A. Executive Interpretation of the Effect of WPR*

The Executive Branch has taken the position from the very beginning that § 2(c) of the WPR does not constitute a legally binding definition of Presidential authority to deploy our armed forces. The Department of State's position set forth in a letter of November 30, 1973 was that § 2(c) was a "declaratory statement of policy." Were the Executive to concede that § 2(c) represented a complete recitation of the instances in which United States Armed Forces could be deployed without advance authorization from Congress, the scope of the Executive's power in this area would be greatly diminished.[5]

Any attempt to set forth all the circumstances in which the Executive has deployed or might assert inherent constitutional authority to deploy United States Armed Forces would probably be insufficiently inclusive and potentially inhibiting in an unforseen crisis. However, some efforts have been made to itemize examples of such situations. In 1975, the Legal Adviser to the Department of State listed six non-exclusive situations in which he contended the President had constitutional authority as Commander-in-Chief to direct United States Armed Forces into combat without specific authorization from Congress:

1. To rescue Americans;

2. To rescue foreign nationals where doing so facilitates the rescue of Americans;

3. To protect U.S. Embassies and legations;

4. To suppress civil insurrection in the United States;

5. To implement and administer the terms of an armistice or cease fire designed to terminate hostilities involving the United States; and

6. To carry out the terms of security commitments contained in treaties.

[5] Whether § 2(c) was to be viewed as an exhaustive, binding list of the President's deployment powers was a major issue between the House and Senate in 1973 and was resolved by the Senate's accession to the House's position that § 2(c) could only be viewed as a statement of policy. *See* H.R. Conf. Rep. No. 547, 93d Cong., 1st Sess. 1–2 (1973).

*Hearings on War Powers: A Test of Compliance, Before the House Comm. on International Relations*, 94th Cong., 1st. Sess. (Part VI) 90 (1975). The Legal Adviser went on to state that the Administration did "not believe that any single definitional statement can clearly encompass every conceivable situation in which the President's Commander-in-Chief authority could be exercised." *Id.* at 90–91.

The President's authority to deploy armed forces has been exercised in a broad range of circumstances during our history; 192 such exercises between 1798 and 1971 are documented in Emerson, *War Powers Legislation*, 74 W. Va. L. Rev. 53, 70 (1971).

## B. Hostilities

The House Report on the WPR had used the word "hostilities" rather than "armed combat" because the former was considered broader. The term "hostilities" was said to encompass "a clear and present danger of armed conflict."[6] The Ford Administration took the position that "hostilities" meant a situation in which units of our armed forces are "actively engaged in exchanges of fire." It added that a situation involving "imminent hostilities" meant a situation in which there is a "serious risk" from hostile fire to the safety of United States Armed Forces. "In our view, neither term necessarily encompasses irregular or infrequent violence which may occur in a particular area."[7]

## C. Consultation

After virtually every WPR incident, Members of Congress have complained about the level, extent or timeliness of whatever consultation actually occurred. Congress has repeatedly insisted that it have "real involvement in [the] decisionmaking."[8] In light of *Chadha*, there may be some significant constitutional question regarding how there can be "real involvement" of Congress, as an institution, in such typically fast-breaking decisionmaking without formal legislative action by both Houses and submission to the President. Notwithstanding this constitutional question, Members of Congress have generally been unsatisfied if the "consultation" has not occurred prior to the decisionmaking, has not included participation by the President himself as well as his staff, or because a perceived insubstantial number of Members have been involved in the consultations.

Based upon the reactions by Members of Congress to the "Mayaguez" consultations by President Ford, it seems likely that virtually any level or degree of consultation will leave some Members unsatisfied. After the hostage

---

[6] H.R. Rep No. 287, 93d Cong., 1st. Sess. 7 (1973).

[7] *Hearings on War Powers: A Test of Compliance, before the House Comm. on International Relations*, 94th Cong., 1st Sess. 39 (1975).

[8] *The War Powers Resolution: A Special Study of the Committee on Foreign Affairs* 211 (House Comm. on Foreign Affairs 1982) (Foreign Affairs Special Study).

rescue mission in Iran, the Senate Committee on Foreign Relations asserted that "consultation" involves "permitting Congress to participate in the decisionmaking," and that the judgment about whether consultation is required in a particular situation "must be made jointly by the President and Congress."[9]

## D. Reporting Requirement

Early in this Administration, the Legal Adviser of the Department of State took the position that the reporting requirement of § 4(c), which calls for periodic reports "so long as such armed forces continue to be engaged in such hostilities or situation," applies only to instances in which a deployment falls within the § 4(a)(1) category of report (actual or imminent hostilities). The rationale was that the word "situations" in § 4(a)(1) refers to "situations" where "imminent involvement in hostilities is clearly indicated by the circumstances." Thus, the Legal Adviser contended that "situations" did not include § 4(a)(2) or § 4(a)(3) circumstances and that the latter conditions did not require a report. This Office disagreed for the following reasons:

> (1) The Executive has never taken the view that the reporting provisions present a constitutional issue and therefore there is no legal need to construe them narrowly to avoid a constitutional issue.

> (2) Congress could have specifically limited the requirement to § 4(a)(1) instead of § 4(a). It did so elsewhere in the WPR. The word "situations" is not in itself a limiting one or a term of art.

> (3) The language in the final version of § 4(c) of the WPR appeared for the first time in the Conference Report. The Senate bill is clearly limited in its reporting requirement to "hostile" situations. S. 440, accompanying S. Rep. No. 220, 93d Cong., 1st Sess. (1973). Thus, the Senate bill cannot be said to determine the meaning of the Conference version, which does not have such a limit in § 4(c). The debates on the Conference Report in the Senate and House suggest nothing about the construction of § 4(c), as applied here. 119 Cong. Rec. 33547 *et seq.*; *id.* at 33858 *et seq.*

The best support for the Department of State's position is a sentence in the Conference Report which states that § 4 "requires supplementary reports at

---

[9] One aspect of the WPR's "consultation" provision worthy of note here is that, because it does not absolutely require consultation in advance of deployment in all cases (rather it requires consultation only "in every possible instance"), the consultation provision does not technically prevent the President from deploying United States Armed Forces for any period of time. Thus, the consultation provision does not go as far as § 1005 of H.R. 5119, considered during the 98th Congress, which, if enacted, would have purported to prevent the President from deploying armed forces in connection with joint military exercises in Central America until a 30-day "waiting" period had passed after the intent to make such a deployment had been communicated to Congress.

least every six months so long as those forces are engaged." The use of the word "engaged" could be interpreted to mean active engagement rather than deployments such as the deployment of the Sinai force. H.R. Rep. No. 547, 93d Cong., 1st Sess. 8 (1973). By itself, this single phrase in the conference report does not seem to overcome the relatively clear text of § 4(c).

On balance, it seemed to serve no important purpose not to provide Congress with periodic updates regarding the status of troop deployments which have been reported under § 4. Finally, taking the position that periodic reports were required only with respect to § 4(a)(1) situations would, with respect to deployments greater than six months duration, require the Executive to take a position as to whether any given circumstance fell within § 4(a)(1) or § 4(a)(2). This Administration, like its predecessors, has believed it to be important not to have to be forced to take such a position with respect to any particular deployment of United States Armed Forces.

This Administration determined to file periodic reports under § 4(c) in all situations. This practice has generally been followed.

### E. Rescue Operations

According to a special study issued by the House Committee on Foreign Affairs, the majority of Members of Congress after the "Mayaguez" incident supported the concept that the President had constitutional authority to use armed forces for a rescue operation of the type involved in that incident. Foreign Affairs Special Study at 216. A staff memorandum to the Chairman of the House Committee on Foreign Affairs even cited historical examples of United States Armed Forces being used to protect American merchant ships and to punish those who interfered with United States shipping. One example cited was President Grant's decision to send elements of the United States Navy to Korea to punish natives for murdering the crew of the American schooner "General Sherman" and burning the ship. *Id.*[10] In 1980, we concluded that the President had constitutional authority to send a military expedition to rescue the hostages held in Iran or to retaliate against Iran if the hostages were harmed. "Presidential Power to Use the Armed Forces Abroad Without Statutory Authorization," 4A Op. O.L.C. 185 (1980).

### F. Justiciability

During this Administration, two attempts to secure judicial resolution of the applicability of the WPR have been made by private litigants and have been rejected by the courts as presenting nonjusticiable issues. *See Crockett* v. *Reagan*, 558 F. Supp. 893 (D.D.C. 1982), *aff'd*, 720 F.2d 1355 (D.C. Cir.

---

[10] In *Durand* v. *Hollins*, 8 F. Cas. 111 (C.C.S.D.N.Y. 1860) (No. 186), the court upheld the legality of the Executive's decision to order the bombardment of a Nicaraguan town which had refused to pay reparations for an attack by a mob on the United States Consul.

277

1983); *Sanchez Espinoza v. Reagan*, 568 F. Supp. 596 (D.D.C. 1983), *aff'd*, 770 F. 2d 202 (D.C. Cir. 1985).

In addition, some Members of Congress have raised with the Administration, including this Office and the Office of the Counsel to the President, the question of the desirability and feasibility of the filing of litigation by Members of Congress to test the constitutionality of several provisions of the WPR. In this Office's view, the Administration would generally have to resist, on constitutional and jurisprudential grounds, the bringing of such issues before the federal courts.

## G. *Implementation of the WPR*

Attached as an appendix to this memorandum is a chart which itemizes each instance since the enactment of the WPR in which the provisions of the WPR may arguably have been implicated. This chart shows whether the Executive filed a report under the WPR and describes the type of report filed. The only § 4(a)(1) report which has been filed was in connection with the "Mayaguez" incident, although the Ford Administration conceded after the fact that the Saigon evacuation was, in its view, a § 4(a)(1) situation. *See* Foreign Affairs Special Study, *supra* note 8, at 201.

## III. Major War Powers Resolution Situations During this Administration to Date

### A. *El Salvador and Nicaragua*

As early as the spring of 1981, questions were raised by Members of Congress and the media regarding the relationship between the WPR and various actions taken by the Executive in El Salvador and Nicaragua. The Administration took the position that the WPR had not been triggered by events in El Salvador. *See* Foreign Affairs Special Study at 249–52. On April 16, 1984, the Administration responded to specific questions from Representative Fascell regarding the involvement of United States Armed Forces in El Salvador.

### B. *Sinai*

On March 19, 1982, the President transmitted to the Speaker and President *pro tempore* a report consistent with § 4(a)(2) of the WPR covering the introduction into the Sinai of United States Armed Forces as participants in the Multinational Force and Observers, a force created to assist in the implementation of the 1979 Treaty of Peace between Egypt and Israel. In that letter, the President stated that this deployment was "undertaken pursuant to Public Law No. 97–132 of December 29, 1981, and pursuant to the President's constitutional authority with respect to the conduct of foreign relations and as Commander-in-Chief of U.S. Armed Forces."

278

## C. Libya

In August of 1981, two Libyan jet fighters attacked aircraft of the Sixth Fleet, which was conducting routine, scheduled operations in the Gulf of Siddra. Although Libya claimed that the area in which the attack occurred was Libyan airspace, the United States took the position that the airspace was over international waters. The Sixth Fleet aircraft downed the two Libyan aircraft.

The Administration subsequently determined that a report pursuant to the WPR was not required because the isolated incident did not rise to the level of "hostilities" as defined in the WPR, and the occasion did not amount to the "introduction" of United States Armed Forces into hostilities as required by the WPR. The Administration took the position that this incident was an unanticipated and unwarranted attack on our aircraft in international territory, and that our aircraft defended themselves fully in accord with international law. The Administration expected no repetition of the incident and anticipated no further action by Libya to violate the rights of the vessels and aircraft of this Nation to travel in international waters and airspace.

## D. Lebanon

The WPR was implicated vis-a-vis Lebanon when, in July of 1982, consideration began of a plan to create a multinational military force to be placed in Lebanon to assume essentially peacekeeping duties. Because United States Armed Forces were to comprise a substantial element of the multinational force, we met on several occasions with representatives of the Office of the Counsel to the President, the Departments of Defense and State, and the National Security Council to address the issues raised and to prepare in draft the appropriate report.

A report consistent with the WPR was ultimately transmitted to the Speaker and President *pro tempore* by the President on August 24, 1982. That report, like its predecessors, was made "consistent with the War Powers Resolution" and did not indicate whether it had been filed pursuant to § 4(a)(1) of the WPR ("hostilities") or § 4(a)(2) (deployment of troops "equipped for combat").[11]

By the time a second six-month report would have been due, the situation in Lebanon had worsened considerably, with United States Armed Forces increasingly coming under attack. A § 4(c) report was submitted to the Speaker and President *pro tempore* by the President on August 30, 1983. By early September of 1983, many Members of Congress were taking the position, publicly and privately, that § 5(b) of the WPR had been triggered because, in their view, United States Armed Forces were now engaged in "hostilities." If § 5(b) had been triggered by these events, then § 5(b)'s 60–day clock on keeping United States Armed Forces in Lebanon would have begun to run. Debate over whether

---

[11] In an exchange of diplomatic letters between the United States and the Government of Lebanon, the Lebanese Government stated: "In carrying out its mission, the American force will not engage in combat. It may, however, exercise the right of self-defense."

§ 5(b) had been triggered by those events became academic, however, because Congress moved to consider and enact a resolution specifically authorizing the retention of United States Armed Forces in Lebanon.

On September 26, 1983, the Senate Committee on Foreign Relations reported out a "compromise," S.J. Res. 159, which had been negotiated with Congress by representatives of the President. On September 27, 1983, the President signed letters to a number of key congressional leaders expressing his intention "to seek Congressional authorization . . . if circumstances require any substantial expansion in the number or role of United States Armed Forces in Lebanon." On October 19, 1983 the President signed S.J. Res. 159 into law and, in doing so, issued a signing statement which carefully reserved judgment on the several constitutional issues raised by S.J. Res. 159.

## E. Chad

On August 8, 1983, the President transmitted a report, consistent with the WPR, to the Speaker and President *pro tempore* in which he reported the introduction into Chad, at the request of that country's government, of various warning and fighter aircraft, accompanied by air and ground logistical support forces.

## F. Grenada

On October 25, 1983, the President transmitted to the Speaker and President *pro tempore* a report, consistent with the WPR, detailing the deployment to Grenada and surrounding waters of United States Armed Forces.

## G. Persian Gulf

In early June of 1984, two Iranian F-4's penetrated a "hot line" established by the Government of Saudi Arabia in the Persian Gulf. The Iranian aircraft were intercepted and shot down by Saudi F-15s inside the "hot line" but outside Saudi territorial waters. The Saudi F-15s were assisted as to target location and refueling by aircraft operated by United States Armed Forces which were at all relevant times flying in Saudi territorial air space on predetermined courses. A Saudi air controller provided the actual targeting information to the Saudi F-15s.

It was determined subsequently that this one-time, unanticipated incident did not trigger the WPR because of the absence of hostilities.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*

# APPENDIX

# POTENTIAL INVOCATIONS OF THE WAR POWERS RESOLUTION

### *War Powers Report Filed/Not Filed*

| Incident | Date | Report |
|---|---|---|
| | *Nixon Administration* | |
| Evacuation of Cyprus (military evacuation of Americans caught in hostilities) | July 21–23, 1974 | No report filed |
| Cambodia Resupply Missions (airdrops) | Summer 1974 | No report filed |
| | *Ford Administration* | |
| Cambodian Reconnaissance Flights (isolated unanticipated firing) | Fall 1974 | No report filed |
| Danang Sealift | April 4, 1975 | Pursuant to § 4(a)(2)[12] |
| Phnom Penh evacuation | April 12, 1975 | Pursuant to § 4 (The report said "taking note of § 4" without specifying a subsection.) |

---

[12] This was the first report ever filed under the WPR. The text of the report stated that President Ford was sending it "in accordance with my desire to keep Congress fully informed on the matter" and "taking note of" the provisions of the WPR It did not concede the validity, or accept the authority, of the WPR.

| Incident | Date | Report |
|---|---|---|
| Saigon evacuation (a major military operation with hostile fire and casualties) | April 30, 1975 | Pursuant to § 4[13] (The message stated that the "operation was ordered and conducted pursuant to the President's constitutional executive power and his authority as Commander-in-Chief of the U.S. Armed Forces.") |
| Mayaguez (Cambodian Communist forces seize American merchant ship — U.S. forces sent on rescue mission; 18 American troops killed or missing and 500 presumed dead) | May 12–16, 1975 | Report filed in accordance with the President's "desire that Congress be informed on this matter" and taking note of § 4(a)(1) of the WPR. |
| Lebanon Evacuation (Navy used to evacuate Americans from Lebanon) | June/July 1976 | No report filed[14] |
| Korean Tree Cutting Incident (troops sent into DMZ to cut tree as retaliation for incident 3 days earlier in which American troops had been killed and wounded) | August 21, 1976 | No report filed[15] |

---

[13] The Legal Adviser of the Department of State later conceded in testimony that this was a § 4(a)(1) situation, but because the operation was over by the time the report was filed, no specification was necessary. *See Hearing, supra*, at 9–10.

[14] Congress seems to have implicitly conceded that the WPR did not require a report or consultation in this incident.

[15] Some Members of Congress reacted with antagonism to the Department of State's position that no report or consultation was required in this incident, but the controversy subsided almost immediately.

| Incident | Date | Report |
|----------|------|--------|
| | *Carter Administration* | |
| Zaire Airlift | May 1978 | No report filed |
| Iran Rescue Operation | April 26, 1980 | Pursuant to the WPR (The report was based on a desire that Congress be informed, it was *consistent* with the reporting provisions of the WPR, and it asserted exercise of Commander-in-Chief powers; no advance consultation was made.)[16] |
| | *Reagan Administration* | |
| El Salvador (security advisers/ defense attaches) | Spring 1981/ August 1984 | No report filed (advisers were armed but not "equipped" for combat) |
| Gulf of Siddra, Libya | August 19, 1981 | No report filed |
| Sinai | March 19, 1982 | Pursuant to § 4(a)(2) |
| Lebanon | August 24, 1982 | Pursuant to the WPR |
| Lebanon | Sept. 29, 1982 | Pursuant to the WPR |
| Chad | August 8, 1983 | Pursuant to § 4 |
| Lebanon | August 30, 1983 | Pursuant to § 4 |
| Grenada | October 25, 1983 | Pursuant to § 4 |
| Persian Gulf | June 4, 1984 | No report filed |

[16] This incident spawned *Crockett* v. *Reagan*, 558 F. Supp. 893 (D.D C. 1982), *aff'd*, 720 F.2d 1355 (D.C. Cir 1983), which resulted in an opinion by the United States District Court for the District of Columbia dismissing the suit as nonjusticiable. *See* Part II.F *supra*.