Catherine FLYNN and Ryan Flynn, a minor, by his mother Catherine Flynn, Plaintiffs-Appellants,

v.

George SHULTZ, Secretary of State of the United States of America, Defendant-Appellee.

No. 84–2427.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 26, 1984.

Decided Nov. 30, 1984.

Anthony D'Amato, Northwestern Law School (Professor of Law), Chicago, Ill., for plaintiffs-appellants.

Mary S. Rigdon, Asst. U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill., for defendant-appellee.

Before CUMMINGS, Chief Judge, POSNER and FLAUM, Circuit Judges.

CUMMINGS, Chief Judge.

This is an appeal by plaintiffs Catherine and Ryan Flynn from the district court's grant of summary judgment in favor of the defendant Secretary of State George Shultz. Plaintiffs seek relief in the nature of mandamus or injunction to compel the Secretary to authorize the testimony of a State Department consular official and to undertake certain other actions allegedly mandated by 22 U.S.C. § 1732. For the reasons set forth below, we affirm the summary judgment.

**I**

The events giving rise to this action began on February 11, 1982, when accountant and consultant Richard Flynn of Bob Schwermer and Associates, Inc. (BSA), an Illinois corporation, travelled to Mexico City. Flynn met with Robert Schwermer, corporate president and sole shareholder of BSA, in Mexico City and was given authority to settle a contract dispute between BSA and Talleres Graficos de la Nacion, a recently nationalized Mexican graphic arts company (¶¶ 10 and 11 of R. Item 1). Plaintiffs admit that BSA had breached its contract with Talleres Graficos which involved the purchase and delivery of over $1.5 million of paper products, although it was alleged below that the breach may have been caused in part by Talleres Graficos (¶ 11 of R. Item 1; Br. 1).

On March 1, 2 and 5, Phillip Battaglia, a consular officer at the American Embassy in Mexico City, in his capacity as arrest and detention officer, attended meetings held between Flynn and Mexican corporate and government officials in order to negotiate a settlement (Exhibit 2-6 of R. Item 7). The Complaint filed by Flynn's wife Catherine and minor son Ryan states that private negotiations had proceeded from February 11 to 22, but on February 22 Flynn suffered a heart attack. He was hospitalized but resumed negotiations on March 1. Subsequent to Robert Schwermer's return to Chicago armed guards were assigned by Talleres Graficos to watch Flynn. On March 12, 1982, after signing an apparently acceptable agreement with Talleres Graficos, he was arrested and incarcerated by Mexican authorities and criminally charged with fraud in relation to his participation in the corporate contract dispute (Exhibit 2-G of R. Item 7). After a bench trial, the Federal District Court of Mexico convicted Flynn of criminal fraud on January 25, 1984, sentenced him to six years in prison and ordered him to pay reparations of $1,536,739.71 (p. 70, Exhibit G of R. Item 11). Plaintiffs view the conviction as baseless and completely unjust (¶ 21 of Complaint). But, e.g., see Weisberg, *The Untold Story of Richard Flynn*, in the September 1984 issue of *Chicago Lawyer* presenting a contrasting view. An appeal of the trial court decision was made to an intermediate appellate court on March 12, 1984, and the conviction was subsequently affirmed (¶ 5 of Rubio Affidavit, Exhibit A of R. 1 Item 1). Flynn's Mexican lawyer has now pending a petition for *amparo*, requesting review by the Mexican Supreme Court (Exhibit B of R. Item 11). We have no knowledge that the Mexican court has acted on the petition.

The record indicates that Flynn has received substantial and continuous assistance from the American Embassy in Mexico City regarding his medical, legal, business and personal problems throughout his ordeal (pp. 10–12 of R. Item 7; Exhibit 2–F of R. Item 7). Nevertheless, he remains in jail in Mexico and has suffered two heart attacks subsequent to his conviction.

The primary objective of plaintiffs in this case is to obtain the testimony of Mr. Battaglia regarding the invalidity of the charges against Flynn, based on Battaglia's attendance at some of the aforesaid meetings. Apparently the testimony would then be proffered to the Mexican Supreme Court (p. 10 of plaintiffs' reply brief). Requests from Flynn and his attorneys for Battaglia's testimony have been refused by State Department officials.[1]

The State Department bases its refusal to authorize Battaglia's testimony on the Department's practices and procedures which require a formal written request from the host State's (here Mexican) judicial authorities as a prerequisite to obtaining authorization for testimony of a consular official concerning official acts (¶¶ 15–17, Exhibit 2 and Exhibit 2–I, 1–9, of R. Item 7). Article 44(3) of the Vienna Convention on Consular Relations, 21 U.S.T. 105, T.I.A.S. No. 6820, provides that "Members of consular post are under no obligation to give evidence concerning matters connected with the exercise of their functions * * *", and under Article 45 of the Convention, only the sending state (here the United States) may waive this immunity and then only by express written waiver. Further, Article II (4) of the United States/Mexican Consular Convention, 57 Stat. 800, T.S. No. 985, states that "A consular officer shall not be required to testify in criminal cases * * * regarding acts performed by him in his official capacity." [2]

The United States will waive the immunity only under carefully controlled circumstances, in order to prevent erosion of the immunity principle (Hergen Declaration, ¶ 14 of Exhibit 2, R. Item 7). According to the State Department, the policy of requiring (i) a formal written request for the testimony from the host state and (ii) a formal written reply from the sending state in response thereto containing a limited waiver (¶ 15, Exhibit 2 of R. Item 7) not only forwards the protection of the immunity, but also helps to secure diplomatic intercourse (¶¶ 14, 18B, Exhibit 2 of R. Item 7) and promote notions of comity among nations by enforcing respect for the internal procedures of foreign courts (¶ 18B, Exhibit 2 of R. Item 7 and Oral Argument). Insofar as the record discloses, the procedure has been applied uniformly with respect to all nations (Exhibit 2–I, 1–9 of R. Item 7). Further, it appears that requests from courts in compliance with the State

---

1. The earliest evidence in the record of such requests is a September 23, 1982, letter (plaintiffs' appendix, Exhibit E) addressed to Knute E. Malmborg of the State Department Office of Legal Advisor. The September 23, 1982, letter refers to prior requests for authorization of Battaglia's testimony directed to former Secretary of State Haig and Secretary Shultz. Flynn's affidavit (plaintiffs' appendix, Exhibit G) confirms this fact. Another letter addressed to Battaglia and petitioning the American Ambassador dated October 16, 1982, similarly requests the testimony (plaintiffs' appendix, Exhibit F). Although the State Department has no record of receipt of these requests, Battaglia responded to the October 16, 1982, letter and noted that Flynn's case had been reviewed by the Embassy on "several occasions" and further advised him to pursue his claims through legal channels available in Mexico (Exhibit 2–A of R. Item 7).

The next request for the testimony came in the form of interrogatories which requested Battaglia to provide answers apparently for use in a suit against Mexican officials. The interrogatory request was forwarded to the State Department on June 15, 1983 (Exhibit 2–A of R. Item 7), and denied in September of 1983 by the office of James G. Hergen, Assistant Legal Advisor for Consular Affairs (Exhibit 2–B of R. Item 7).

2. Although Article II (2) of the United States/Mexican Consular Convention states that "[i]n criminal cases the attendance at court by a consular officer as a witness may be demanded by the plaintiff, the defendant or the judge," Article II(4), quoted above, specifically immunizes a consular officer from being compelled to testify in criminal cases concerning acts performed in the officer's official capacity.

Department's procedures are normally granted (¶ 16, Exhibit 2 and Exhibit 2–I, 1–9 of R. Item 7).

It is not disputed that no State Department official has received a request for Battaglia's testimony from the Mexican courts or any Mexican government authorities. It is unclear, however, whether, to what extent and at what level Flynn and his attorneys have petitioned the Mexican courts to request formally a waiver of consular immunity from the United States (p. 8 n. 6 of R. Item 11, Flynn Affidavit, R. Item 9, Rubio Affidavit, R. Item 1). Although Flynn was informed in October 1982 that the matter "can only be settled through legal channels in Mexico" (Exhibit A of R. Item 11), the earliest evidence of his being informed of the specific required procedures is the September 9, 1983, telegram from the State Department to the American Embassy refusing to authorize Battaglia to reply to Flynn's June 1983 interrogatories (Exhibits 2 (at p. 2) and 2–B of R. Item 7). The State Department simultaneously indicated that it would not refuse a formal Mexican judicial request of waiver of consular immunity (defendant's br. 32), but that until there was such a request no further relief was possible for Flynn (p. 8 of R. Item 7).

■ Plaintiffs in this action principally seek an order in the nature of mandamus or injunction to "compel the defendant to authorize consular official Phillip Battaglia to present testimony to the Supreme Court of Mexico on behalf of Richard Flynn." (Br. 7). Further, plaintiffs request that the defendant undertake certain actions allegedly mandated by The Hostage Act (22 U.S.C. § 1732) which states that:

Whenever it is made known to the President that any citizen of the United States has been unjustly deprived of his liberty by or under the authority of any foreign government, it shall be the duty of the President forthwith to demand of that government the reasons of such imprisonment; and if it appears to be wrongful and in violation of the rights of American citizenship, the President shall forthwith demand the release of such citizen, and if the release so demanded is unreasonably delayed or refused, the President shall use such means, not amounting to acts of war, as he may think necessary and proper to obtain or effectuate the release; and all the facts and proceedings relative thereto shall as soon as practicable be communicated by the President to Congress.

The statute and the Sixth Amendment of the U.S. Constitution, it is claimed, place a clear duty on the defendant to authorize Battaglia's testimony. The conclusion below that the district court possessed jurisdiction over the action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1361[3] is correct because plaintiffs assert claims arising under the laws and Constitution of the United States and request relief in the nature of mandamus from an officer of the United States.

The district court held that neither the Hostage Act nor the Sixth Amendment provided a basis for ordering the defendant to authorize Battaglia's testimony. The court also noted that 22 U.S.C. § 1732 itself did not entitle plaintiffs to any specific relief because, to the extent that the defendant's actions were reviewable at all, they satisfied any requirements under the Hostage Act and did not amount to an abuse of discretion.

## II

Although this case is properly before us in a jurisdictional sense, a decision on the merits also requires presentation of a justiciable controversy. The nature of this action and the relief requested by plaintiffs squarely raise concerns embodied in the

---

**3.** 28 U.S.C. § 1331 gave the district court federal question jurisdiction while 28 U.S.C. § 1361 provides:

The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.

political question doctrine. Although it is just one aspect of the broader justiciability issue, that doctrine has been applied in cases involving extremely diverse issues. C. WRIGHT, THE LAW OF FEDERAL COURTS § 14 (4th ed. 1983). It rests primarily on the principle of separation of powers and the policy of judicial self-restraint. *Id.* The Supreme Court's most comprehensive articulation of the attributes of the political question doctrine was set forth in *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663:

> It is apparent that several formulations which vary slightly according to the settings in which the questions arise may describe a political question, although each has one or more elements which identify it as essentially a function of the separation of powers. Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.
>
> Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for nonjusticiability on the ground of a political question's presence. The doctrine of which we treat is one of "political questions," not one of "political cases." The courts cannot reject as "no law suit" a bona fide controversy as to whether some action denominated "political" exceeds constitutional authority. The cases we have reviewed show the necessity for discriminating inquiry into the precise facts and posture of the particular case, and the impossibility of resolution by any semantic cataloguing.

*Id.* at 217, 82 S.Ct. at 710. It is well settled that "the conduct of the foreign relations of our government is committed by the Constitution to the executive and legislative departments—'the political' departments of the government and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decisions." *Oetjen v. Central Leather Co.*, 246 U.S. 297, 302, 38 S.Ct. 309, 311, 62 L.Ed. 726.

That the foreign affairs power of the executive would be affected by granting any of plaintiffs' requests is evident. An order to authorize Battaglia's testimony would to some extent impinge on the State Department's control over the important international treaty right of consular immunity and could result in diplomatic repercussions with Mexico (¶¶ 14, 18, Exhibit 2 of R. Item 7). Certain requested relief under Section 1732, such as an order that compels the United States to request the Mexican Government to advance reasons explaining Flynn's detention, would amount to directing the conduct of this country's foreign relations. Yet we should not apply the political question doctrine in a talismanic fashion to bar the plaintiffs relief merely because the issues presented involve foreign affairs. The Supreme Court in *Baker* clearly required a "discriminating inquiry into the precise facts and posture" of each case and stated that "it is error to suppose that every case or controversy which touches on foreign relations lies beyond judicial cognizance." *Baker*, 369 U.S. at 211, 82 S.Ct. at 707; see also *Olegario v. United States*, 629 F.2d 204, 216–219 (2d Cir.1980); *Matter of Naturalization of 68 Filipino War Veterans*, 406 F.Supp. 931, 944–948 (N.D.Cal.1975).

While courts will scrutinize executive and legislative action in several substantive areas touching on foreign relations,[4] the

---

**4.** 13 WRIGHT, MILLER & COOPER, FEDERAL PRACTICE AND PROCEDURE § 3534, p. 310–317 (1975).

standard of review applied in those cases is nonetheless a very deferential one. For example, an area concerning foreign affairs that has been uniformly found appropriate for judicial review is the protection of individual or constitutional rights from government action. *Mathews v. Diaz*, 426 U.S. 67, 81–82, 96 S.Ct. 1883, 1892, 48 L.Ed.2d 478; *Olegario*, 629 F.2d at 217–218; *United States v. Decker*, 600 F.2d 733, 738 (9th Cir.1979); *68 Veterans*, 406 F.Supp. at 946–947; *United States v. Tiede*, 86 F.R.D. 227, 243–244; but cf. *Hopson v. Kreps*, 622 F.2d 1375, 1380 n. 6 (9th Cir.1980) (declining to "adopt the view that 'personal liberty' interests will more likely trigger judicial review than claims related to 'economic interests' "). This protection of the individual unquestionably extends to cases involving United States Government action taken against our own citizens abroad. See *Reid v. Covert*, 354 U.S. 1, 5, 77 S.Ct. 1222, 1224, 1 L.Ed.2d 1148 (plurality opinion); *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1511–1515 (D.C. Cir.1984) (en banc). But again, while "individual rights are protected carefully," it is "within a framework that takes account of the broad substantive power of other branches," and it is clear that "respect for the political branches affects but does not preclude, decision on the merits." 13 WRIGHT, MILLER & COOPER, FEDERAL PRACTICE AND PROCEDURE § 3534, p. 314 (1975). In *Mathews*, the Supreme Court noted that "[a]ny rule of constitutional law that would inhibit the flexibility of the political branches of government to respond to changing world conditions should be adopted only with great caution." 426 U.S. at 81, 96 S.Ct. at 1892. It is clear, therefore, that it is proper for this Court to consider whether the defendant's policies or actions violate the Constitution. Our review, however, must proceed fully cognizant of the constitutionally committed powers of the executive in the area of foreign affairs.

■ As a general rule, requests for relief involving foreign affairs which are not based on a constitutional right, treaty, congressional directive or established administrative procedure fall squarely under the category of political questions outlined in *Baker* which involve "potential judicial interference with executive discretion in the foreign affairs field" and which seek to "dictate foreign policy." *Crockett v. Reagan*, 558 F.Supp. 893, 898 (D.D.C.1982); see *Freiberg v. Muskie*, 651 F.2d 608, 609 (8th Cir.1981) (summarily dismissing a suit seeking to compel the U.S. State Department to intervene on plaintiff's behalf with officials of the West German Government); *Dumas v. President of the United States*, 554 F.Supp. 10, 17 (D.Conn.1982) (denying plaintiff's request for an order requiring the United States government to make formal demand of the Governments of China and North Korea to allow recovery of remains of United States service personnel buried within the two countries); *Nat. Org'n For Reform of Marijuana Laws (NORML) v. United States*, 452 F.Supp. 1226, 1234–1235 (D.D.C.1978) (denying plaintiff's request for a mandatory injunction directing defendants to use their "best efforts" to persuade the Government of Mexico to call a moratorium on herbicide spraying program).

Courts, however, have found it proper to review executive actions taken pursuant to treaties, statutory authority or established administrative procedures.[5] See *Hopson*, 622 F.2d at 1380–1382 (appropriate to re-

---

5. It is an unsettled question whether a direct conflict between the Executive and Legislative branches regarding United States foreign policy presents a nonjusticiable political question or a resolvable controversy regarding the apportionment of power among the branches of government under the Constitution. Compare *Goldwater v. Carter*, 444 U.S. 996, 997, 100 S.Ct. 533, 62 L.Ed.2d 428 (Justice Powell, concurring);

*Olegario*, 629 F.2d at 218; *Mitchell v. Laird*, 488 F.2d 611, 614 (D.C.Cir.1973); *Crockett*, 566 F.Supp. at 898, with *Goldwater*, 444 U.S. at 1002, 100 S.Ct. at 536 (Justice Rehnquist, concurring). In the present case, the defendant has not argued that Section 1732 in any way impinges on his constitutional power to conduct foreign relations and consequently no political question issue of this type is before us.

view whether Commerce Department regulations were consistent with the 1946 International Whaling Convention, 62 Stat. 1716); *Decker*, 600 F.2d at 737 (proper to review whether the State Department's selective approval of International Pacific Salmon Fisheries Commission regulations was inconsistent with a 1937 United States/Canadian Convention, 50 Stat. 1355); *Sneaker Circus, Inc. v. Carter*, 566 F.2d 396, 401–402 (2d Cir.1977) (proper to review whether trade agreements between United States, the Republic of Korea and the Republic of China were negotiated in procedural conformity with the Trade Act of 1974); *United States v. Megahey*, 553 F.Supp. 1180, 1197–1198 (E.D.N.Y.1982) (proper to review executive acts pursuant to Foreign Intelligence Surveillance Act of 1978, 50 U.S.C. § 1801 *et seq.*, because the "Act merely directs judges to make findings regarding time, persons, and places at which surveillance is directed and regarding governmental compliance with procedures of the Act" and calls only for "traditional judicial analysis and findings"); *Haitian Refugee Ctr. v. Civiletti*, 503 F.Supp. 442, 472–473 (S.D.Fla.1980) (proper to review Immigration and Naturalization Service District Director's decision because Director's duty "rests upon a solid statutory and treaty foundation"). Consequently, there is some precedent to support a review whether the State Department's actions here were consistent with the Hostage Act.

In certain instances, challenged executive action in the field of foreign affairs is found to present a nonjusticiable question despite the existence of relevant congressional activity. The nature of the fact-finding required to determine the propriety of executive acts in relation to legislative directives remains, in some circumstances, beyond the competence of the court. The issues presented by plaintiffs, with one exception, involve such circumstances.

This problem implicates a different category of political question than the issue examined so far, *supra* p. 1190, of a power constitutionally committed to a political branch of government. It instead is characterized by a lack of judicially discoverable and manageable standards for resolution. For example, in *Crockett*, 558 F.Supp. at 896–899, the court concluded that a resolution of the issue of whether the War Powers Resolution, 50 U.S.C. §§ 1541–1548, was applicable to the American military presence in El Salvador required inquiry into sensitive military matters and disputed questions of fact regarding the military situation in El Salvador which it lacked "the resources and expertise (which are accessible to the Congress) to resolve * * *." *Id.* at 898. The court found that the case before it did not present the "type of political question which involves potential judicial interference with executive discretion in the foreign affairs field." 558 F.Supp. at 898.

A similar lack of judicially discoverable standards prompted a like result in *Dumas*, 554 F.Supp. at 17, and *Holtzman v. Schlesinger*, 484 F.2d 1307, 1312 (2d Cir.1973). In *Holtzman*, the Second Circuit suggested that the executive had not zealously carried out the "Mansfield Amendment," which called upon the President to remove all military forces from Cambodia and forthwith to obtain the release of all American prisoners of war and an accounting for all soldiers missing in action. The Court, however, dismissed the plaintiffs' claims, noting that the inquiry into the removal and repatriation of American soldiers "involves diplomatic and military intelligence which is totally absent in the record before us, and its digestion in any event is beyond judicial management."

*Dumas* applied the *Holtzman* reasoning and held that a request for relief under House Resolution 292, which provides that the executive "make the return of, or a satisfactory accounting for * * * American prisoners of war a primary objective of the foreign policy of the United States," was not justiciable. The court refused to "interfere or probe into this serious and delicate area of diplomatic negotiation" in order to resolve the controversy.

With respect to plaintiffs' claims that the Hostage Act requires certain specific en-

forceable actions by the Executive, including authorization of testimony and a waiver of consular immunity, our analysis presented in Part III of this opinion convinces us that, with one exception, the issues presented most clearly fall within the "judicially unmanageable" category of political question. Although this case is factually different from the cited cases in that it does not inquire into any aspect of military action abroad, resolution of the issues of the case would similarly require ascertainment of facts and standards of decision that are beyond judicial discovery and management. Further, granting plaintiffs' requests would interfere with the Executive's constitutionally committed discretion to conduct foreign relations. Part IV of this opinion, however, explains that our consideration of the extent of defendant's inquiry into the injustice of Flynn's deprivation of liberty is not barred by the political question doctrine.

### III

Plaintiffs argue that the Hostage Act clearly applies to Flynn's situation and that compliance with the statute requires that defendant: 1) inquire into the question of whether Flynn's deprivation of liberty was unjust, 2) demand of the Government of Mexico reasons for his imprisonment, 3) determine that the imprisonment is in violation of the "rights of American citizenship," 4) demand the release of Flynn, and 5) if the release demanded is unreasonably delayed or refused, use such means, not amounting to acts of war, as he may think necessary and proper to obtain or effectuate the release, and 6) communicate the relevant facts and proceedings to the Congress. Plaintiffs further claim that the President has a duty to authorize Mr. Battaglia to testify under the statute's directive that the President "shall use such means * * * as he may think necessary and proper to obtain * * * the release * *." All but the first of these arguments must fail.

**6.** See discussion at pp. 1195–1197.

■ First, the district court correctly found that any action potentially required by the Hostage Act is contingent upon a preliminary determination by the President that a citizen has been "unjustly deprived of his liberty by a foreign government" (p. 7 of the opinion below). It appears that there is a duty of inquiry and report on the part of the President with respect to this preliminary determination. See *Redpath v. Kissinger,* 415 F.Supp. 566, 568 (W.D.Tex.), affirmed, 545 F.2d 167 (5th Cir.1976). While it might be appropriate for a court to order such an inquiry in the absence of any meaningful action by the executive with respect to this duty,[6] review of the substance of the inquiry and subsequent decision clearly presents a nonjusticiable political question. Unlike the cases cited above, *supra* pp. 1191–1192, which indicate the propriety of judicial review of executive action in the field of foreign affairs taken pursuant to a treaty, statute or administrative procedure, the circumstances before us involve a statute without standards upon which judicial review could be undertaken. See *Holtzman,* 484 F.2d at 1312; *Crockett,* 558 F.Supp. at 898; *Dumas,* 554 F.Supp. at 17. Neither the terms of the Hostage Act nor its legislative history give any indication of what is meant by the phrase "unjustly deprived." Not only would it be inappropriate for us to scrutinize the defendant under such a vague and subjective standard, but the vagueness of the term itself indicates to us that Congress did not intend traditional judicial review of the Executive's action taken pursuant to this statute. Rather, Congress seems to have contemplated that the President would make a subjective judgment. See *infra* p. 1195.

It is unclear whether the term "unjustly deprived" means a violation of some minimum standard of due process constituting a "denial of justice" under the international law concept of "injuries to aliens." See Lillich, *The Current Status of the Law of State Responsibility for Injuries to Aliens* in International Law of State Responsibility for Injuries to Aliens (R.

Lillich ed. 1983); L. SOHN & T. BUERGENTHAL, INTERNATIONAL PROTECTION OF HUMAN RIGHTS 23 (1973). The legislative history of the Hostage Act indicates that the term "unjustly deprived" may not refer to international law, since the term "unlawfully arrested or unlawfully detained" was expressly defined during the legislative debate as an arrest or detention "contrary to the laws of nations" and was ultimately rejected. See 39 Cong.Globe, 40th Cong., 2d Sess. 4359 (1868) (Sen. Howard). In summary, this Court lacks any specific standard for scrutinizing the President's application of the term to facts before him.

Second, even if this Court believed there was an objective standard that it could implement, our review would require the presentation of facts supported by evidence and not mere allegations of those facts. We note that plaintiffs have presented this Court and the court below with little if any factual basis for reviewing the propriety or validity of Flynn's deprivation of liberty, and that the very nature of the type of issue presented here seems to preclude traditional resolution of a factually based dispute. Resolution of the question whether Flynn was unjustly deprived of his liberty would require a review of the events that transpired in Mexico leading to his arrest and incarceration and a review of the Mexican trial and appellate courts' decisions. Plaintiffs stated in oral argument that the record of the trial court which convicted Flynn of fraud is sealed and unavailable. Only the defendant provided the district court and ultimately us with an "unofficial" translation of the Mexican trial court's opinion—"unofficial" because of time constraints and the "very poor quality" copies of the original opinion (Exhibit 6 of R. Item 11). On this record we simply lack the resources and competence to discover and resolve the questions of fact regarding events surrounding Flynn's incarceration and conviction in Mexico.

■ Finally, apart from the issue of justiciability, the only relief that could be granted pursuant to Section 1732 under any arguably relevant standards would be an order to the defendant to exercise his discretion under the statute and conduct an inquiry into the plaintiffs' allegations of Flynn's unjust deprivation of liberty. Mandamus may be used to compel the performance of a ministerial duty when the obligation to perform such an act is plainly defined. See *Interstate Commerce Comm. v. New York N.H. & H.R. Co.*, 287 U.S. 178, 203–204, 53 S.Ct. 106, 113, 77 L.Ed. 248; *Wilbur v. United States*, 281 U.S. 206, 218, 50 S.Ct. 320, 324, 74 L.Ed. 809; *Panko v. Rodak*, 606 F.2d 168, 169 (7th Cir.1979), certiorari denied, 444 U.S. 1081, 100 S.Ct. 1034, 62 L.Ed.2d 765; 8 FED.PROC.L.ED. § 20:438; 7 (Part 2) MOORE'S FEDERAL PRACTICE ¶ 81.07 (2d ed. 1984). Further, "[i]t also is employed to compel action, when refused, in matters involving judgment or discretion, but not to direct the exercise of discretion in a particular way nor to direct the retraction or the reversal of action already taken in the exercise of either." *Interstate Commerce Comm. v. Humboldt Steamship*, 224 U.S. 474, 484, 32 S.Ct. 556, 559, 56 L.Ed. 849; *Wilbur*, 281 U.S. at 218, 50 S.Ct. at 324; 8 FED.PROC.L.ED. § 20:438.

■ Assuming, *arguendo*, that the abuse of discretion standard of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), is relevant to this inquiry, as suggested by the plaintiffs in their amended complaint, the appropriate standard of review would be "whether on the record the agency could reasonably make the finding." K. DAVIS, ADMINISTRATIVE LAW TEXT 543 (1972). Where a finding of "abuse of discretion" is made, the remedy to be granted is a remand of the issue to the relevant agency and not a substitution of judgment by the court. See, *e.g.*, *Udall v. F.P.C.*, 387 U.S. 428, 450, 87 S.Ct. 1712, 1724, 18 L.Ed.2d 869; *F.C.C. v. R.C.A.*, 346 U.S. 86, 98, 73 S.Ct. 998, 1006, 97 L.Ed. 1470; *Ritter Transport, Inc. v. I.C.C.*, 684 F.2d 86, 88 (D.C.Cir.1982); *Las Cruces T.V. Cable v. F.C.C.*, 645 F.2d 1041, 1053 (D.C.Cir.1981); *Doe v. Hampton*, 566 F.2d 265, 284 (D.C.Cir.1977). Since, as noted previ-

ously, any duty under § 1732 is contingent upon the preliminary determination of "unjustly deprived" and since this Court cannot make that determination itself, nearly all the relief requested is unavailable to the plaintiffs.

Although our holding makes unnecessary consideration of the appropriateness of ordering other relief requested by the plaintiffs (apart from an order of inquiry), such relief would be equally unavailable. An order declaring that a particular detention is "wrongful and in violation of the rights of American citizenship" would be improper for the reasons listed above with respect to the "unjustly deprived" issue. Compare 39 Cong. Globe 4359–4360 (Senators Frelinguysen, Summer & Morrill), 4356 (Sen. Morrill), 4233 (Sen. Morton) with *Id.* at 4233 (Sen. Williams) (meaning of term "rights of American citizenship" ambiguous).

With regard to an order directing the defendant to request reasons for a United States citizen's detention abroad or an order directing that a particular act be undertaken as necessary and proper to obtain the release of a United States citizen (here the authorization of testimony), such relief would impermissibly interfere with the Executive's discretion to conduct foreign affairs and would, consequently, be inconsistent with the political question doctrine. Further, the legislative history of the Hostage Act indicates that the failure of the President to take any action after a finding of a wrongful detention is made is not remediable by the courts, nor, perhaps, even Congress, but solely by the electorate:

> [The bill] points out that it is the will of Congress that the executive government shall take all proper steps in all such cases * * *. [W]e can do nothing but declare the principle and if the Government does not do its duty the people will remedy it, and we must leave the proper remedy to those who have it in their hands.

39 Cong. Globe 4358 (Sen. Fessenden) (referring to bill ultimately enacted).

## IV

■ Unlike the other relief requested by the plaintiffs, our enforcement of a duty of inquiry does not interfere with the President's conduct of foreign relations, nor does our review of the extent of the inquiry implicate standards that are beyond judicial management or discovery. Consequently the political question doctrine does not bar our consideration of plaintiffs' claims that the Hostage Act requires defendant to inquire whether Flynn's deprivation of liberty was unjust and that the defendant has failed to satisfy the inquiry requirement. Despite the narrow reading apparently given it by the Supreme Court, the language and the legislative history of the Hostage Act convince us that Congress placed a judicially enforceable duty on the Executive to inquire into the circumstances of an American citizen's extended detention abroad.

The Supreme Court's recent interpretation of the Hostage Act in *Dames & Moore v. Regan,* 453 U.S. 654, 675–78, 101 S.Ct. 2972, 2984–86, 69 L.Ed.2d 918, raises serious questions as to whether, as a matter of statutory construction, apart from the justiciability issue, the Act has any application to the present case. The High Court considered the scope of the statute and pointed out that the Act was originally directed at the problem of "certain countries refusing to recognize the citizenship of naturalized Americans traveling abroad, and repatriating such citizens against their will." *Id.* at 676, 101 S.Ct. at 2985. In the Court's view, this purpose explained the statute's reference to "imprisonment 'in violation of the rights of American citizenship.'" *Id.* The Court held that the Act did not specifically authorize the President's suspension of claims against Iranian assets because the U.S. "hostages were not seized out of any refusal to recognize their American citizenship—they were seized precisely because of their American citizenship." *Id.* at 677, 101 S.Ct. at 2985. If the Supreme Court's test of the applicability of § 1732 is whether an American citizen is "seized out of a refusal to recognize their American citizenship," *id.* at 677, 101 S.Ct. at 2985, then the

statute has no application to the present case. No evidence presented below indicated that the Mexican Government refused to recognize Flynn's citizenship or that his citizenship had anything to do with his detention.

There is, however, some support in the legislative history for a broader reading of the statute and specifically the term "rights of American citizenship." Senator Williams, the sponsor of the bill which was eventually enacted, criticized another version of the Act:

> This bill * * * only provides a remedy where a citizen is arrested upon the mere allegation, and upon no other ground that naturalization in the United States does not dissolve his allegiance to the Government under which he was born. If an American citizen is arrested in a foreign country upon any other ground, upon any other pretext whatever, or if he be a native citizen then he is not according to the terms of this bill entitled to the protection of this government.

39 Cong. Globe 4233.

The Senator then described his own bill which ultimately became law:

> [The President] shall ascertain whether that imprisonment is rightful or wrongful, whether or not it violates the rights of American citizenship; and if he ascertains that the imprisonment is unjust and unfounded, that it is made on some frivolous pretext, that it is made for some alleged political opinion which the party entertains to which that Government does not give its sanction, that he shall proceed upon ascertaining the facts and demand the release of that citizen so imprisoned * * *.
>
> * * * I believe it is a fact that the citizens of no civilized country upon the globe receive so little attention in foreign countries from their own government as the citizens of the United States and this law, if it is to amount to anything at all, ought to compel the Executive to proceed

forthwith to give attention to these complaints whenever it is alleged * * * that a citizen of the United States is suffering in a foreign prison * * *.

*Id.*

It is important to recognize that the scope of this statute intended by Congress presents a different issue from that of a court's competence to specifically enforce the Act.

We do, however, agree with *Redpath, supra,* that when the President is informed that a United States citizen is imprisoned abroad, the Hostage Act requires the Executive to undertake a meaningful inquiry into the circumstances of the detention in order to determine whether the citizen is unjustly deprived of liberty. This conclusion is consistent with the language of the Hostage Act and its legislative history. Senator Williams, who, as seen, sponsored the bill enacted into law, noted that "whenever it shall be made known to the President of the United States that an American citizen has been deprived of liberty in a foreign country it shall be the duty of the President to do something * * *." 39 Cong. Globe 4233. He also commented that "whenever it is alleged to the Executive of the country that a citizen of the United States is suffering in a foreign prison, it shall be the duty of the Executive forthwith to proceed and examine the case * * *." *Id.*

■ The examination undertaken by the State Department here satisfies any inquiry and report requirement.[7] First, our highest ranking official in Mexico, Ambassador Gavin, personally requested an independent legal review of Flynn's criminal case by Dwyer McNeese, an American attorney practicing in the Mexican courts. The request for the review was made on May 24, 1984, approximately four months after Flynn's conviction and over two years after his initial incarceration of March 12, 1982 (Exhibit 2–F of R. Item 7).[8]

---

**7.** The Court expresses no opinion as to the defendant's argument that plaintiffs lack standing to demand any of the relief requested in their pleadings.

**8.** Although this Court is disturbed by the extend-

McNeese's review of the conviction facially appears to be thorough and this Court has no reason to believe that he was not competent to perform the review (Exhibit 2–H of R. Item 7). His report concludes that there was nothing improper or discriminatory about Flynn's criminal conviction of fraud. A cable quoting McNeese's report was sent to James Hergen, Assistant Legal Advisor for Consular Affairs at the Department of State in Washington, D.C. *Id.* Finally, the Department requested a review of Flynn's conviction in light of an April 19, 1984, legal opinion by Anthony D'Amato, Professor of Law, Northwestern University in Chicago, and counsel for plaintiffs in this action, which found the Mexican trial court's conviction invalid (see Mr. D'Amato's July 26, 1984 letter, Exhibit A–7 of plaintiffs' appendix). The D'Amato review resulted in another legal opinion completed by McNeese and Jorge Reyes Colin, specialist in litigation matters, which was forwarded to the State Department in Washington. The opinion refutes several of Mr. D'Amato's contentions and reiterates the validity of the trial court conviction under Mexican law (Exhibit B. of R. Item 11). In light of the deferential standard of review required in cases touching on foreign affairs, the Executive has already fulfilled

any duty of inquiry and report under the Hostage Act.

**V**

■ There is no merit in the plaintiffs' claims that the defendant's failure to authorize Mr. Battaglia's testimony violated the Fifth Amendment[9] and the Sixth Amendment or that these Amendments provide Flynn with a "personal right" to the testimony of Battaglia. As a point of departure for this inquiry, plaintiffs have conceded that "the Sixth Amendment cannot be applied directly against Mexican officials or the Mexican criminal court that convicted Richard Flynn" (Br. 22). Obviously, the Mexican government is not bound by the requirements of our Constitution even when prosecuting a United States citizen, and it is not this Court's responsibility to supervise "the integrity of the judicial system of another sovereign." See *Jhirad v. Ferrandina,* 536 F.2d 478, 484–485 (2d Cir.1976); *United States of America v. Clark,* 470 F.Supp. 976, 979–980 (D.Vt.1979); *Ex Parte La Mantia,* 206 Fed. 330, 332 (S.D.N.Y.1913). Assuming, *arguendo,* that the Sixth Amendment guarantees our citizens some rights and places some duty on our officials in the context of foreign prosecutions,[10] we will consider plaintiffs' arguments at face value.

ed delay of the State Department before inquiry was undertaken into the propriety of Mr. Flynn's detainment, our review is limited to a determination of whether a sufficient inquiry has in fact taken place.

9. We are considering plaintiffs' Fifth Amendment claim, without ruling whether the issue was properly raised before this Court, because the claim relies upon and is closely intertwined with the Sixth Amendment claim raised below. Also, in view of the novelty of plaintiffs' arguments and the substantial public attention surrounding Flynn's plight, it is appropriate to explore this question here.

10. Although neither side was able to cite any authority with respect to plaintiffs' novel application of the Sixth Amendment to foreign prosecutions, we agree with the district court's conclusion that "the Compulsory Process Clause [of the Sixth Amendment] appears to be a limitation on the United States' power to prosecute criminal defendants. * * * The purpose of the

Compulsory Process clause is not to give United States citizens a right to compel the testimony of United States officials in the courts of other sovereigns" (pp. 11–12 of the lower court opinion). See THE BILL OF RIGHTS: A DOCUMENTARY HISTORY 506, 508, 690–691, 799, 1029 (B. Schwartz ed. 1971) (no indication from the debate leading to ratification of the Constitution and the Bill of Rights that application of the Sixth Amendment to foreign court prosecutions was contemplated).

Plaintiffs cite *Washington v. Texas,* 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019, as supporting Flynn's right to obtain witnesses in a Mexican Court. *Washington,* however, merely invalidated a Texas statute that allowed an alleged accomplice to be called as a witness by the prosecution but not by the defendant in violation of the Sixth Amendment. There is no indication that the Supreme Court in *Washington* intended its holding to have any application to foreign judicial proceedings. Instead, the Court specifically considered the application of the Sixth Amendment to state criminal proceedings. *Id.*

Plaintiffs first argue that a violation of Flynn's Fifth Amendment due process rights has resulted from an application of defendant's "arbitrary and discriminatory policy of providing testimony such as Battaglia's to the prosecution but not to the defense" (Br. 17). The implementation of the waiver of consular immunity policy allegedly constitutes "discriminatory treatment in favor of the Mexican prosecution and against Flynn's efforts in his defense," and is inconsistent with a United States citizen's Sixth Amendment right to have the same access to witnesses as the prosecution. See n. 10.

Plaintiffs appear to concede that the policy is not discriminatory *per se* with regard to the Sixth Amendment. They note that as a matter of policy and practice the State Department normally allows testimony of consular officials in foreign judicial proceedings where there has been a formal request by the courts of the host state government and that testimony favorable to either the defendant or prosecution is equally authorized (Br. 18). But it is asserted that the defendant's policy is discriminatory in actual practice because Flynn's requests to the Mexican trial court for a subpoena for Battaglia allegedly were ignored by the trial judge and because the complaining party in this instance, Talleres Graficos, is a nationalized Mexican corporation.

Assuming these assertions were sufficient to prove that the Mexican court's actions in the present case were discriminatory, we fail to understand how such actions render the State Department's policy discriminatory. If the Mexican court was unwilling to request Battaglia's testimony, it appears unlikely that it would have accepted the testimony if proffered. Rather, such action would have run the risk of offending Mexican judicial and executive officials and would be contrary to the inter-

ests of Flynn and our officials in Mexico (Hergen Declaration, Exhibit 2, ¶ 18B of R. Item 7). Surely the Fifth and Sixth Amendments do not specifically require that the State Department risk offending a foreign nation in this situation in light of the Constitution's general commitment of the powers to conduct foreign relations to the political branches of government. See *Mathews*, 426 U.S. at 81, 96 S.Ct. at 1892.

To the extent a wrong has been committed against Mr. Flynn in this instance, it is the fault of the Mexican Government and not of the State Department. Furthermore, no evidence before us indicates that a change in the defendant's policy would rectify any such wrong, and it is not unreasonable to believe that the requested change could make matters worse.

Plaintiffs then retreat from their original position and argue that the State Department policy is invalid on its face. The gist of this argument is that because our government could not grant our courts or government officials the authority in a criminal prosecution to allow the testimony of witnesses solely when requested by the prosecution (see *Webb v. Texas*, 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330; *Washington*, 388 U.S. at 23, 24, 87 S.Ct. at 1925), the State Department similarly may not limit authorization of consular testimony to cases where it is requested by the foreign government. Plaintiffs' argument fails in two manners. First, it erroneously merges the Mexican judiciary and other Mexican government officials with the Mexican prosecuting authorities—an assumption which this Court is unwilling and unable to make. Second, plaintiffs assume that the State Department's policy grants the Mexican government and judicial authorities the power to deny the defendant access to witnesses in his favor. As noted earlier, Mexico already possesses this power and is not bound by the United States Constitution.[11]

at 17–19, 87 S.Ct. at 1922–23. Similarly, the holding of *Reid v. Covert, supra*, that United States citizens enjoy the full protection of our Constitution when our Government acts abroad is of no help in determining the correctness of plaintiffs' specific constitutional interpretation.

11. To the extent the actions of the Mexican trial court might have constituted a violation of international law in the context of "injuries to aliens," the plaintiffs have pursued no such claim before this Court and we therefore decline to consider their standing to do so or this

Rather, the State Department policy merely recognizes this reality and implements notions of comity and respect for the internal judicial procedures of foreign courts.

Finally, the plaintiffs argue that the Sixth Amendment right of the accused in all criminal prosecutions "to have compulsory process for obtaining witnesses in his favor" places a duty on the State Department in the present case to assist, or at least not to impede, a United States citizen's attempt to obtain a witness in his favor in a foreign prosecution. The defendant's policy allegedly "paved the way" (Br. 22) for Flynn's failure to obtain Battaglia's testimony and for Flynn's loss of liberty. But defendant's policy assists and does not impede a United States citizen's right to obtain the testimony of witnesses in foreign court proceedings. Requests for waivers of consular immunity are "routinely authorized" by the State Department (Exhibit 2, ¶ 16 of R. Item 7). Conditioning a grant of consular immunity waiver on a request from a host state government, as noted above, implements important notions of comity and offers a reasonable solution to a difficult problem.

Plaintiffs ultimately seem to argue that the consular immunity right itself is unconstitutional. The elevation of plaintiffs' claim of a right of assistance to obtain witnesses in foreign prosecutions to a constitutional status would seriously encroach upon the international treaty right of immunity from compelled consular testimony regarding official acts. It does not appear that plaintiffs would consider their alleged constitutional right vindicated if we ordered the State Department to take requests for waivers of consular immunity directly from our citizens, if the State Department subsequently denied their request. Rather, plaintiffs argue that there is a specific right to obtain the testimony itself, and that a denial would violate the

Sixth Amendment in the case of Flynn and presumably in the case of fellow citizens subject to foreign prosecutions. The Sixth Amendment cannot require such a severe intrusion upon a treaty right which is crucial to the effective functioning of consular officials abroad. To the extent plaintiffs limit the scope of their constitutional right, and instead ask us to review the merits of a given request for waiver by a U.S. citizen, we decline to do so. For reasons consistent with the political question doctrine and as already noted, this Court simply lacks the resources and competence to conduct such an inquiry.

The district court's order granting defendant's motion for summary judgment is affirmed.[12]

---

Court's jurisdiction to hear this type of claim. See OLIVER, *Legal Remedies and Sanctions* in INTERNATIONAL LAW OF STATE RESPONSIBILITY FOR INJURIES TO ALIENS 61 (R. Lillich ed. 1983).

**12.** This affirmance of the district court's summary judgment renders moot any ruling on the defendant's motion to strike plaintiffs' statement of facts and additional argument.