844 F.2d 195
 56 USLW 2608
 Mark A. SMITH, Former United States Prisoner of War; Melvin
C. McIntire, Sergeant First Class, United States Army; Anne
M. Hart, Wife of service member listed as missing in action;
Dorothy M. Shelton, Wife of existing Prisoner of War;
Kathryn Fanning, Wife of service member listed as missing in
action; Jerry L. Dennis, Brother of service member lost in
Southeast Asia, Plaintiffs- Appellees,
v.
Ronald REAGAN, President of the United States; Caspar
Weinberger, United States Secretary of Defense; George
Schultz, United States Secretary of State; James A.
Williams, General, Director of the United States Defense
Intelligence Agency; and each of their respective
predecessors and successors, in their official capacity,
Defendants-Appellants.
 No. 87-1661.
 United States Court of Appeals,
Fourth Circuit.
 Argued Feb. 2, 1988.
Decided April 18, 1988.
Rehearing and Rehearing En Banc Denied May 18, 1988.
 
 Mark Bernard Stern, Appellate Staff, Civil Div., Dept. of Justice (Richard K. Willard, Asst. Atty. Gen., Samuel T. Curran, U.S. Atty., Michael Jay Singer, Appellate Staff, Civil Div., Dept. of Justice, on brief), for defendants-appellants.
 Mark Louis Waple (Hutchens & Waple, on brief), for plaintiffs-appellees.
 Before WILKINSON, Circuit Judge, BUTZNER, Senior Circuit Judge, and ELLIS, United States District Judge for the Eastern District of Virginia, sitting by designation.
 WILKINSON, Circuit Judge:
 
 
 1
 This suit was brought under what has come to be known as the Hostage Act, 22 U.S.C. Sec. 1732 (1982). Plaintiffs sought a declaration that American prisoners of the Vietnam War continue to be held in captivity by the governments of Vietnam, Laos, and Cambodia, that those prisoners "enjoy the full protection and benefit" of the Hostage Act, and "that the Defendants shall comply" with the Act's requirements. They also sought a writ of mandamus compelling the President to comply with the Hostage Act.
 
 
 2
 Defendants moved to dismiss the case for lack of subject matter jurisdiction, contending that the suit raises a nonjusticiable political question. The district court granted the motion with respect to the claim for mandamus, but denied it with respect to the claim for declaratory relief. It then granted defendants' motion for an interlocutory appeal. Because the suit raises a nonjusticiable political question, and because the Hostage Act does not create a private right of action, we reverse and remand with instructions to the district court to dismiss this suit.
 
 I.
 
 3
 In January, 1973, the United States entered into an agreement, generally known as the Paris Accords, on ending the Vietnam War. This agreement provided for the return of service personnel held captive by all parties to the conflict. The Paris Accords also called for the parties to assist each other in obtaining a full accounting of personnel missing in action.
 
 
 4
 Despite the formal end of the hostilities, however, and despite the signing of the Paris Accords, the families of American service personnel still listed as missing in action after the Vietnam War (MIAs) continue to live with the possibility that these men remain alive and in captivity in a foreign land. The families of some men listed as killed in action have likewise been haunted by reports that loved ones whom they thought dead remain alive and captive.
 
 
 5
 These families have labored for years to obtain an accounting of missing servicemen and the release of any who may remain captive. The National League of Families has monitored negotiations on this issue between the United States and the governments of southeast Asia. It has endeavored to focus public attention on the problem and, in some cases, has worked with the various governments in attempting to resolve it.
 
 
 6
 The efforts of the United States government to obtain an accounting began prior to the fall of South Vietnam in 1975 and have continued since then. Those efforts have been extensive. The POW/MIA Interagency Group, whose members include State and Defense Department personnel, staff members of the National Security Council, representatives of the Joint Chiefs of Staff, staff members of the House and Senate Foreign Affairs and Foreign Relations Committees, and members of the National League of Families, coordinates U.S. efforts to secure an accounting of missing personnel and the release of any personnel still in captivity. Congressional delegations and missions from the Departments of Defense and State have met with the Vietnamese on this issue. The United States Defense Intelligence Agency (DIA) evaluates reports of POW/MIA sightings. Congress also oversees attempts to account for U.S. personnel, both through committee hearings and through the efforts of the House Task Force on American Prisoners & Missing in Southeast Asia.
 
 The Hostage Act states, in pertinent part:
 
 7
 Whenever it is made known to the President that any citizen of the United States has been unjustly deprived of his liberty by or under the authority of any foreign government, it shall be the duty of the President forthwith to demand of that government the reasons of such imprisonment; and if it appears to be wrongful and in violation of the rights of American citizenship, the President shall forthwith demand the release of such citizen, and if the release so demanded is unreasonably delayed or refused, the President shall use such means, not amounting to acts of war, as he may think necessary and proper to obtain or effectuate the release ...
 
 
 8
 22 U.S.C. Sec. 1732.
 
 
 9
 This suit was brought under the Act by a former Army prisoner of the Vietnam War and an active Army Sergeant, who were joined and ultimately replaced as plaintiffs by relatives of American personnel lost or missing in southeast Asia. It was brought on behalf of a class of "all living American Prisoners of the [Vietnam War] currently being held in captivity by the foreign governments of Vietnam, Cambodia, Laos or other foreign government" against the President, the Secretaries of Defense and State, and the Director of the DIA. Plaintiffs sought a writ of mandamus compelling defendants to comply with the terms of the Hostage Act, and a declaration that the plaintiff class exists and enjoys the protection of the Hostage Act.
 
 
 10
 Defendants argued that the suit poses a nonjusticiable political question and moved to dismiss for lack of subject matter jurisdiction. The district court granted the motion with respect to the mandamus claim, ruling that the claim "directly involves foreign policy decisions and falls squarely under the category of political questions ... which involve 'potential judicial interference with executive discretion in the foreign affairs field' and which 'seek to dictate foreign policy.' " Smith v. Reagan, 637 F.Supp. 964, 967 (E.D.N.C.1986).
 
 
 11
 The district court denied appellants' motion to dismiss the declaratory judgment claim. The court held that the question whether the plaintiff class exists, and whether its members are protected by the Constitution and the Hostage Act, did not raise a nonjusticiable political question, but only a question of fact "arising out of rights derived from the United States Constitution and law." Id. at 968. When defendants moved the court to reconsider its judgment, the court affirmed its earlier ruling, but granted defendants' motion to certify the court's order for interlocutory appeal. Smith v. Reagan, 663 F.Supp. 692 (E.D.N.C.1987).
 
 II.
 
 12
 Plaintiffs would have this court declare that they "enjoy the full protection and benefit of [the Hostage Act] and further that the Defendants shall comply with such statutory provisions." They thus ask the courts to determine whether American service personnel remain in captivity in southeast Asia and to assess the adequacy of the executive's efforts to secure the release of any who do. Either course of action is fraught with peril for the judiciary. In order to grant the relief requested, the courts would be asked to intrude in the conduct of sensitive diplomatic negotiations. Furthermore, they would be asked to make determinations of fact in an area where the judiciary lacks power to obtain information, and in which it has neither expertise to evaluate the information brought before it nor standards to guide its review. Finally, as different courts address these issues, the judiciary may speak with multiple voices in an area where it is imperative that the nation speak as one. These difficulties lead us to conclude that this suit presents a nonjusticiable political question.
 
 
 13
 "In determining whether a question falls within [the political question] category, the appropriateness under our system of government of attributing finality to the action of the political departments and also the lack of satisfactory criteria for a judicial determination are dominant considerations." Baker v. Carr, 369 U.S. 186, 210, 82 S.Ct. 691, 706, 7 L.Ed.2d 663 (1962) (quoting Coleman v. Miller, 307 U.S. 433, 454-55, 59 S.Ct. 972, 982, 83 L.Ed. 1385 (1939)). The boundaries of the political question doctrine have never been marked with precision, but the Supreme Court's discussion of the doctrine in Baker v. Carr has provided much useful guidance. In Baker, the Court listed several factors, the presence of any one of which may render an issue a nonjusticiable political question. This case presents a textbook example of at least two of those factors, a "textually demonstrable constitutional commitment of the issue to a coordinate political department" and "a lack of judicially discoverable and manageable standards for resolving it." Baker, 369 U.S. at 217, 82 S.Ct. at 710.
 
 A.
 
 14
 Plaintiffs seek in this suit to investigate and evaluate the executive branch's conduct of foreign policy, an area traditionally reserved to the political branches and removed from judicial review. In Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp., 333 U.S. 103, 111, 68 S.Ct. 431, 436, 92 L.Ed. 568 (1948), the Supreme Court stated:
 
 
 15
 [T]he very nature of executive decisions as to foreign policy is political, not judicial. Such decisions are wholly confided by our Constitution to the political departments of the government, Executive and Legislative. They are delicate, complex, and involve large elements of prophecy. They are and should be undertaken only by those directly responsible to the people whose welfare they advance or imperil. They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and which has long been held to belong in the domain of political power not subject to judicial intrusion or inquiry.
 
 
 16
 See also Haig v. Agee, 453 U.S. 280, 292, 101 S.Ct. 2766, 2774, 69 L.Ed.2d 640 (1981); Harisiades v. Shaughnessy, 342 U.S. 580, 588-89, 72 S.Ct. 512, 518-19, 96 L.Ed. 586 (1952).
 
 
 17
 Not every suit that touches on foreign relations is beyond judicial cognizance. Baker, 369 U.S. at 211, 82 S.Ct. at 706. A cause of action under the Hostage Act, however, would inescapably involve courts in matters of the most delicate diplomacy. A charge that a foreign government has "unjustly deprived" an American citizen of liberty is likely to have far-reaching and unforeseeable effects on the conduct of foreign relations. Similarly, the adequacy of actions taken under the Hostage Act to secure the release of such a citizen is likely to be difficult to assess and the success of those actions difficult to predict. Congress therefore gave great discretion to the President in making, or refraining from making, such a charge and in choosing the actions to be taken after such a charge is made. The Act fails to define the term "unjustly deprived," suggesting that "Congress seems to have contemplated that the President would make a subjective judgment." Flynn v. Schultz, 748 F.2d 1186, 1193 (7th Cir.1984), cert. denied, 474 U.S. 830, 106 S.Ct. 94, 88 L.Ed.2d 77 (1985). It directs the President to take the actions he deems "necessary and proper" after concluding that there has been an unjust deprivation of liberty. The Act's vagueness suggests that Congress intended the President to exercise broad discretion, and intended to foreclose "traditional judicial review" in this area. Id. The courts, unschooled in "the delicacies of diplomatic negotiation [and] the inevitable bargaining for the best solution of an international conflict," Holtzman v. Schlesinger, 484 F.2d 1307, 1312 (2d Cir.1973), cert. denied, 416 U.S. 936, 94 S.Ct. 1935, 40 L.Ed.2d 286 (1974), must leave these sensitive determinations where the text of the Constitution and the terms of the Hostage Act both place them--with the political branches of our government.
 
 
 18
 Courts considering suits to compel executive action under the Hostage Act have consistently held that the substance of such action is unreviewable. In Flynn, the court did find that the Act creates a reviewable duty in the President to inquire into allegations of the improper foreign imprisonment of an American citizen. 748 F.2d at 1193. It went on to hold, however, that "[w]hile it might be appropriate for a court to order such an inquiry ... review of the substance of the inquiry and subsequent decision clearly presents a nonjusticiable political question." Id. See also Redpath v. Kissinger, 415 F.Supp. 566, 568-69 (W.D.Tex.), aff'd, 545 F.2d 167 (5th Cir.1976). Plaintiffs do not allege that the President has failed to look into allegations that American servicemen remain captive in southeast Asia; indeed, their documentary evidence consists largely of reports on MIAs compiled by the executive branch. Rather, plaintiffs ask the courts to conduct an independent inquiry into the status of the servicemen. In so doing, the courts would be undertaking a task which Congress has explicitly assigned to the executive.
 
 
 19
 Plaintiffs would simply place too many actors on the diplomatic stage. The Supreme Court noted in Baker that issues involving foreign relations often pose political questions because, in part, they "uniquely demand single-voiced statement of the Government's views." 369 U.S. at 211, 82 S.Ct. at 707. The status of these servicemen has been the subject of negotiations between the United States and the governments of southeast Asia for over a decade. It is important that this country speak with a single, clear voice in these negotiations. Pronouncements by the federal courts may differ sharply from those of the executive, and might themselves not be consistent. Although this suit purports to include within the class all living POWs and MIAs, we can hardly be certain that a decision here would foreclose future adjudication of the issue by different parties or on different theories. The resulting cacophony would necessarily hamper United States negotiators. It might prove a significant hindrance to diplomatic efforts to effectuate the release of any Americans who may still be in captivity. These considerations combine to convince us that the issues plaintiffs seek to litigate are so "vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations" as to be "exclusively entrusted to the political branches of government [and] immune from judicial inquiry or interference." Harisiades, 342 U.S. at 588-89, 72 S.Ct. at 519.
 
 B.
 
 20
 Any court disposed to entertain this action would encounter formidable obstacles. The "lack of judicially discoverable and manageable standards for resolving" the issues reinforces our view that this case presents a nonjusticiable political question. Baker, 369 U.S. at 217, 82 S.Ct. at 710. Furthermore, the courts face intractable difficulties in gathering relevant information, and lack the expertise to evaluate what information would be put before them.
 
 
 21
 The Hostage Act is broad and open-ended. Neither the statutory language nor the legislative history give any indication of the meaning of the term "unjustly deprived," which triggers executive duties under the Act. See Flynn, 748 F.2d at 1193. Once the President has concluded that an American citizen has been "unjustly deprived" of liberty, he must determine whether the deprivation is "wrongful" and whether release, once demanded, is "unreasonably delayed or refused," and must "use such means, not amounting to acts of war, as he may think necessary and proper to obtain or effectuate the release" of that citizen. Each of these nebulous directives vests extraordinary discretion in the executive. See Redpath, 415 F.Supp. at 569 ("official actions [contemplated by the Act] are not ministerial, but are clearly of a diplomatic nature involving the exercise of discretion by the Executive"). Accountability lies in oversight by Congress or in criticism from the electorate, but not in the judgments of the courts. The Hostage Act sets the terms of political debate, not the standards of adjudication. The adversary process here is more political than litigious. See Mikva & Neuman, The Hostage Crisis and the "Hostage Act," 49 U.Chi.L.Rev. 292, 341 (1982) (the Act gives the President "room for discretion" but his actions are "subject to oversight by Congress").
 
 
 22
 The courts also lack the powers for the task which plaintiffs would have them undertake. The political branches have worked for years, since the end of American involvement in hostilities in southeast Asia, to obtain a full accounting of missing Americans from foreign governments. The courts, which lack even the limited tools of diplomatic leverage, are unlikely to be more successful in obtaining information from those governments. Further, the courts lack the expertise to evaluate what information would be laid before them. Much of the evidence proffered by plaintiffs consists of intelligence reports, with which courts are inexpert and unfamiliar. In the end, evaluation of this information requires not so much the application of law as the exercise of judgment. That judgment should be made by the political branches of our government.
 
 C.
 
 23
 This suit also raises the question of whether there exists the power to award plaintiffs any meaningful remedy. A declaration that defendants "shall comply" with the Hostage Act would be the functional equivalent of a writ of mandamus. See Sanchez-Espinoza v. Reagan, 770 F.2d 202, 208 n. 8 (D.C.Cir.1985) (where federal officers are defendants, declaratory relief is "the practical equivalent of specific relief such as an injunction or mandamus, since it must be presumed that federal officers will adhere to the law as declared by the court"). The courts would be precluded from issuing such a declaration for the same reasons which caused the district court to decline to issue a writ of mandamus: such a declaration would "seek to dictate foreign policy." Smith v. Reagan, 637 F.Supp. at 967. A declaration that the court had found, by a preponderance of the evidence, that the plaintiff class exists would afford plaintiffs little real relief. The judiciary cannot oversee the conduct of foreign relations, and could not order the President to take specific action to obtain the release of any American it declared to be the object of a wrongful detention.
 
 
 24
 The Act itself prescribes no remedy for presidential noncompliance and courts would be hard-pressed to devise their own. Holding the President in contempt for insufficient efforts on behalf of Americans held abroad is hardly realistic. Without the prospect of that sanction, the status of equitable relief becomes little more than advisory. The remedy, as we have noted, must come through the political process. Indeed, our polity assumes that elected officials will lend their ears to sympathetic pleas and worthy causes.
 
 III.
 
 25
 Even if the issues raised by this suit were justiciable, the suit must be dismissed. The Hostage Act does not create an explicit private right of action, and we decline to infer one.
 
 
 26
 In determining whether an otherwise silent federal statute implicitly creates a private right of action, our "focal point" must be congressional intent. Thompson v. Thompson, --- U.S. ----, 108 S.Ct. 513, 516, 98 L.Ed.2d 512 (1988). See also Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis, 444 U.S. 11, 24, 100 S.Ct. 242, 249, 62 L.Ed.2d 146 (1979); Touche Ross & Co. v. Redington, 442 U.S. 560, 575-76, 99 S.Ct. 2479, 2488-89, 61 L.Ed.2d 82 (1979). "[U]nless this congressional intent can be inferred from the language of the statute, the statutory structure, or some other source, the essential predicate for implication of a private remedy simply does not exist." Northwest Airlines, Inc. v. Transport Workers Union of America, AFL-CIO, 451 U.S. 77, 94, 101 S.Ct. 1571, 1582, 67 L.Ed.2d 750 (1981). The regulation of access to the courts is largely a legislative task, and one that courts should hesitate to undertake. For this reason, implied rights of action are disfavored, and will not be found in the absence of clear evidence of legislative intent. See Thompson, 108 S.Ct. at 521-22 (Scalia, J., concurring). Because the Hostage Act treads on matters of foreign policy which have long been recognized as the exclusive province of the political branches, we must be especially certain of congressional intent before inferring a private cause of action.
 
 
 27
 The language of the Hostage Act argues against such an action. The Act calls for congressional review of presidential action taken pursuant to the Hostage Act, requiring that "all the facts and proceedings relative [to such actions] shall as soon as practicable be communicated by the President to Congress." 22 U.S.C. Sec. 1732. Provision for congressional oversight does not necessarily rule out congressional intent to provide for private enforcement, but it is evidence that Congress set forth with some care the enforcement scheme it intended to create. The legislative history of the Act indicates further that failure of the President to take actions required by the Hostage Act "is not remediable by the courts, nor, perhaps, even Congress, but solely by the electorate." Flynn, 748 F.2d at 1195. Speaking of the bill that became the Hostage Act, Senator Fessenden stated:
 
 
 28
 [W]e can do nothing but declare the principle; and if the Government does not do its duty the people will remedy it, and we must leave the proper remedy to those who have it in their hands.
 
 
 29
 Cong.Globe, 40th Cong., 2d Sess. 4358 (1868).
 
 
 30
 In determining whether a private right of action is implicit in a federal statute, we must also consider "the contemporary legal context." Cannon v. University of Chicago, 441 U.S. 677, 698-99, 99 S.Ct. 1946, 1958, 60 L.Ed.2d 560 (1979). We must "assume that our elected representatives, like other citizens, know the law," id. at 696-97, 99 S.Ct. at 1958, and we acknowledge that legislation is informed by "the state of the law at the time the legislation was enacted." Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, 456 U.S. 353, 378, 102 S.Ct. 1825, 1839, 72 L.Ed.2d 182 (1982). The Hostage Act was enacted in 1868, long before the practice of finding implied private rights of action became common. See J.I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). It also antedated the era of widespread resort to the judiciary to compel executive action. The 40th Congress, in enacting the Hostage Act, is likely to have done so with the understanding that it created only those rights of action explicit in the text of the statute, and its failure to provide explicitly for a private right of action is powerful evidence of its intent not to provide one at all.
 
 
 31
 Finally, plaintiffs argue that a private right of action in their favor should be inferred because they are members of "the class for whose especial benefit the statute was enacted." Cort v. Ash, 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975) (emphasis in original). Whether or not this is correct, it alone does not enable this court to find such a right. "[T]he mere fact that the statute was designed to protect [certain individuals] does not require the implication of a private cause of action ... on their behalf.... The dispositive question remains whether Congress intended to create any such remedy." Transamerica Mortgage Advisors, 444 U.S. at 24, 100 S.Ct. at 249. We hold that Congress did not so intend.
 
 IV.
 
 32
 The desire to account for American service personnel still missing after the Vietnam War runs deep. Such an accounting would go far in healing the wounds which remain from that difficult chapter in our nation's history. Perhaps more importantly, it would end the anxiety and frustration, if not all of the pain, borne by the families of these servicemen.
 
 
 33
 We must, however, be mindful of the constraints our Constitution places on the judiciary. Our system of government confines each branch to a limited sphere. No one branch of our government can cure all ills, and institutional hubris is more likely than not to result in new and greater ills. In this suit, plaintiffs ask the courts to intrude in an area in which they have no rightful power and no compass. Congress, in enacting the Hostage Act, appears to have been well aware of the judiciary's limitations. Those limitations embody the strict and binding force of law.
 
 
 34
 We reverse the judgment of the district court and remand with directions to dismiss this lawsuit.
 
 
 35
 REVERSED.